[L. A. No. 22911. In Bank. Dec. 6, 1955.]

CITY OF VERNON, Appellant, v. CITY OF
LOS ANGELES, Respondent.

Carson B. Hubbard, City Attorney, Edward R. Young, John F. O'Hara and John W. Shenk III for Appellant.

Roger Arnebergh, City Attorney, Bourke Jones and John L. Flynn, Assistant City Attorneys, and Weldon L. Weber, Deputy City Attorney, for Respondent.

SCHAUER, J.—The city of Vernon by its complaint for declaratory relief and injunction seeks a determination that under contracts entered into between it and defendant city of Los Angeles in 1909, 1925, 1931, and 1938 it is entitled to discharge a certain amount of its sewage through the sewer system of Los Angeles without payment to Los Angeles; Vernon also

seeks injunctive enforcement of the contracts and damages in the amount which Vernon is required to pay by the judgment in *People* v. *City of Los Angeles* (1948), 83 Cal.App.2d 627 [189 P.2d 489] (an action in which the State obtained judgment against the parties to this action and others to abate the nuisance caused by their discharge of sewage into Santa Monica Bay). By its answer Los Angeles seeks determinations that the contracts are without effect; that Vernon be required to finance its share of the cost of new sewage disposal facilities built by Los Angeles in accordance with the decision for the state in *People* v. *City of Los Angeles* (1948), *supra*, 83 Cal.App.2d 627; and that Vernon has no right to use the sewage system of Los Angeles except on payment of its share of the cost of the facilities used.

After trial the superior court decreed that Vernon is not entitled to the relief sought; that the contracts between Vernon and Los Angeles (except for certain salvageable elements) are terminated and ''have been invalid and unenforceable since a time not later than the entry of . . . judgment in the State Abatement Action''; and that Vernon is entitled to use the new facilities only on payment of its share of their cost. Vernon has appealed. It contends that the decision of the superior court is based upon the erroneous determination that the decree in the abatement action (*People* v. *City of Los Angeles* (1948), *supra,* 83 Cal.App.2d 627 [189 P.2d 489]) decided against Vernon the issues raised in this action as to its contracts with Los Angeles. We have concluded that although such determination of the trial court is erroneous, its judgment can and should be upheld on the basis of its further determination that the performance of the contracts was excused and the contracts were discharged because performance became impossible except at impractical, excessive, unreasonable expense not contemplated by the parties when the contracts were made.

### The Effect of the Abatement Decree

The determination of the trial court in this action that the essential issues herein were finally decided against Vernon in the abatement action is a serious error which, as is hereinafter explained, involves an attempt to rewrite or disregard a substantial portion of a final judgment of the superior court and opinions of a District Court of Appeal and of this court. Although this error does not require reversal, discussion of it in connection with the background of this action will aid understanding of the present controversy.

The factual background of this litigation and the abatement action is as follows: Years ago cities (including Vernon) other than Los Angeles and sanitation districts in the Los Angeles area which subsequently became defendants in the abatement action found themselves financially unable to construct adequate sewage disposal facilities. The city of Los Angeles had constructed an outfall sewer system with a capacity which exceeded its then expected needs. Beginning in 1909 with Vernon, the cities other than Los Angeles and the sanitation districts made contracts with Los Angeles by which Los Angeles agreed to dispose of their sewage. ''[T]he contracts between the city of Los Angeles and the other municipalities and sanitation districts under discussion were for an indefinite period, or, in some instances, for the life of the outfall sewer system itself, and in no instance carried any provision permitting the contracts to be cancelled when or if the city of Los Angeles required the use of that portion of the capacity of its outfall sewer system covered by the above-mentioned contracts'' (p. 631 of 83 Cal.App.2d).

Sewage was originally disposed of by Los Angeles under its 1909 contract with Vernon by transporting it through an outfall sewer to Hyperion and discharging it raw into Santa Monica Bay about 900 feet offshore. In 1922, pursuant to requirements of the State Department of Public Health, Los Angeles commenced construction of new facilities, including a screening plant and a submarine tube extending about a mile offshore at Hyperion. These facilities were operated under a permit issued to Los Angeles in 1923.

In 1940, because Los Angeles had violated the terms of the 1923 permit and created a nuisance, the state suspended the permit; however, it granted a temporary permit on condition that Los Angeles at once prepare plans for the construction and financing of adequate sewage disposal works. Los Angeles did not comply with the terms of the temporary permit and the state revoked such permit. It also revoked permits of other defendants, including Vernon. Thus all rights of the contracting parties to dispose of sewage through the existing facilities were terminated.

In 1943 the state brought the abatement action. Judgment for the state was entered on February 1, 1946, and affirmed in *People* v. *City of Los Angeles* (1948), *supra*, 83 Cal.App.2d 627. This court denied a hearing, and the United States Supreme Court denied certiorari (335 U.S. 852 [69 S.Ct. 80, 93 L.Ed. 400]).

Both before and after the institution of the abatement action Los Angeles attempted to work out means, alone or in cooperation with the other cities, whereby the sewage could be adequately disposed of by methods conforming with health and safety laws. Vernon did not make similar efforts; it sat by, resting on its claim that all its responsibility for disposition of its sewage, including its responsibility to the People of the State of California, had been assumed by Los Angeles. Through the years the pressing need for continued and improved disposition of sewage increased with the increase of the volume of sewage originating in the cities which used the Los Angeles facilities, including, as found by the trial court, "the enormous increase in volume of sewage originating in the City of Vernon as a result of the greatly increased industrial activity within its boundaries."

After certiorari to review the abatement injunction was denied, Vernon, having elected to use the Los Angeles system, did not, as required by the injunction, report what steps it had taken to comply with the portion of the injunction which required it to arrange to finance its share of the cost of the new plant; instead, it reported its reasons for having taken no steps to comply with that portion of the injunction. It claimed that it was unable to understand the decree, although other cities had been able to understand and comply with its terms.

In the abatement action the trial court determined that Los Angeles had plans for an acceptable new plant to be built at Hyperion; that it would be to the best interests of all defendants to dispose of their sewage through such new plant although it would be possible for some of the defendants other than Los Angeles, including Vernon, to make arrangements at great expense to dispose of their sewage without using the facilities of Los Angeles. The judgment ordered that Los Angeles build a new plant of sufficient capacity to abate the nuisance; that each other defendant either provide its own facilities for disposing of its sewage in a safe and sanitary manner or arrange to finance its share of the cost of the new plant proportionate to gallonage allotted to it; that such other defendants notify the court of the manner in which they elected to comply with the abatement injunction. The decree provided for continuing supervision by the court. Vernon elected to dispose of its sewage through the new facilities to be built by Los Angeles but did not make arrangements to finance its share of the cost of such facilities until it was compelled to do so by contempt proceedings (see *City of Vernon* v. *Superior Court* (1952), 38 Cal.2d 509 [241 P.2d 243]).

As previously indicated, in the present action defendant Los Angeles takes the position and the trial court determined that it had been decided in the abatement action that Vernon has no rights against Los Angeles under the sewage disposal contracts which are the subject of the present action. The answer filed by Vernon in the abatement action denied the allegations against Vernon of the state's complaint, set forth the contracts of 1909, 1925, 1931, and 1938 with Los Angeles, and alleged Vernon's position that under the contracts Los Angeles agreed to keep its sewer system in good condition; that upon delivery of Vernon sewage into the Los Angeles system Los Angeles had sole responsibility for its sanitary disposal; that Los Angeles alone was responsible for the nuisance and for the construction at its sole expense of facilities to abate it.

■ The superior court in its findings of fact in the present action purports to determine "that the issues created by the denials and affirmative allegations set forth in the answer of the City of Vernon [in the abatement case] were unavoidably and unequivocally before the court in said case . . . and by the judgment entered in that case, were judicially determined by the court against the City of Vernon." The relevant facts are, however, that at the trial of the abatement action the court refused to admit the contracts between Vernon and Los Angeles in evidence, and the findings and judgment in the abatement action did not refer to the particular issues there and here raised by Vernon as to its rights under the contracts. The conclusions of law in the abatement action contained the following statements which relate to the contracts: Each city has the primary duty to dispose of its sewage in a safe and sanitary manner; none of the defendants is released from such duty by any permission or right created by contract, ordinance, or otherwise; "regardless of past relationships or contractual or other rights, privileges or obligations between the various defendants," the state is entitled to an injunction restraining defendants from maintaining sewage works without a permit and from discharging sewage into the bay in a manner which would create a nuisance.

It is apparent from the findings, conclusions, and judgment in the abatement action that the trial court there decided that Vernon's contracts with Los Angeles were no defense in that action but that it did not purport to decide what contractual rights Vernon might have against Los Angeles apart from the abatement action. On the appeal of Vernon and others in the abatement action the District Court of Appeal made it clear that such was the effect of the abatement injunction so far as

Vernon's rights against Los Angeles were concerned. It said (p. 648 of 83 Cal.App.2d), "the court rightfully refrained from passing upon any of the rights, obligations or liabilities affecting the various defendants by reason of their contractual relations with each other, and left those matters open for future adjudication in a proper proceeding. Although the aforesaid contracts concerned the disposal of sewage, the court would not be justified in this action to adjudicate the rights existing between the various appellants by reason of their contracts one with the other. Insofar as the judgment herein is concerned, if any of the appellants have any rights against the city of Los Angeles, or vice versa, by reason of any existing contract, such rights have been preserved and may be enforced in a proper action."

After the affirmance of the abatement injunction and the denial of a hearing and of certiorari, Vernon instituted the present action. It did not take steps, by levy of taxes or issuance of bonds or imposition of charges, to raise funds for payment of its share of the cost of the new sewage plant, and it was found guilty of contempt for failing to comply with the abatement injunction. It sought review of the contempt judgment, contending, among other things, that bringing the present action was compliance with the injunction. This court rejected that contention and affirmed the contempt judgment. (*City of Vernon* v. *Superior Court* (1952), *supra,* 38 Cal.2d 509, 518.) We said, "The obvious purpose of the injunction was to get the nuisance promptly abated and to that end to get the new plant built and paid for without the delay attendant on independent or later ensuing litigation to determine the validity and effect of the old contracts of Vernon and other corporate defendants." This court then quoted the language of the District Court of Appeal which is quoted in the preceding paragraph and said of that language and of the superior court ruling there under discussion, "This ruling preserves to petitioners all contractual rights they may possess under the mentioned contracts but likewise it requires them to settle or litigate those rights independently of compliance with the injunction decree" (p. 519 of 38 Cal.2d).

It therefore appears that the determination of the trial court in the present action that the abatement injunction decided adversely to Vernon the questions of its contractual rights against Los Angeles is erroneous and contrary to the clear language of the District Court of Appeal in affirming the injunction and of this court in upholding the determination that Vernon was in contempt.

*Legal Impossibility*

As a further ground of decision the trial court determined that there was available to Los Angeles the defense of impossibility—not literal impossibility, but impracticability due to excessive and unreasonable expense. (See *Mineral Park Land Co.* v. *Howard* (1916), 172 Cal. 289, 293 [156 P. 458, L.R.A. 1916F 1]; Rest., Contracts, § 454.) For the reasons hereinafter stated, we conclude that this determination of the trial court is tenable.

Pursuant to the 1909 agreement Los Angeles built within Vernon and connected to the Los Angeles disposal system a main sewer and a lateral sewer for the joint use of the two cities. By that contract Los Angeles agrees to operate and maintain the joint sewers and Vernon agrees to pay 5 per cent of the cost of operation and maintenance. Each city agrees to operate and maintain its own sewer system at its own expense, "other than those portions which are constructed and used by them jointly. . . . [I]n consideration of the construction of the [joint] sewers above named, by the City of Los Angeles at its own cost and expense, and of the connection of said sewers with the outfall sewer also constructed by the said City of Los Angeles [for discharge of sewage into the bay] and of the privilege of connecting the sewer system to be constructed hereafter by the said City of Vernon with said sewers, and of discharging the sewage of said City of Vernon with said sewers," Vernon shall pay Los Angeles 50 per cent of the cost of the main sewer, not to exceed $12,000, and 20 per cent of the cost of the lateral sewer, not to exceed $1,300. The agreement contains no provision as to its termination.

As previously stated (*ante*, p. 713), pursuant to a state permit issued in 1923, Los Angeles built a screening plant and submarine tube at Hyperion. These facilities were used in performance of the 1909 contract.

By the 1925 contract Vernon agrees in its use of sewers to abide by the rules which Los Angeles prescribes for the use of its sewers.

The 1931 agreement (which was never carried out but rather became the subject of much controversy between the parties) provides that Vernon shall be permitted to discharge not more than 11.7 cubic feet of sewage per second[1] into the Los Angeles sewer system pursuant to the 1909 contract; for this

---

[1]The amount of sewage discharged by Vernon has always been and now is less that 11.7 cubic feet per second.

right Vernon is not required to pay anything; upon the execution of the agreement Vernon shall pay $234,220 for the right to discharge additional amounts of sewage in excess of 11.7 cubic feet per second and $36,200 as its share of the cost of construction by Los Angeles in Vernon of a relief sewer; for sewage in excess of 11.7 cubic feet per second Vernon shall pay Los Angeles such proportion of the annual cost of operation, maintenance, replacement, and repair of the sewage disposal facilities of Los Angeles used by Vernon as the additional quantity of sewage discharged by Vernon bears to the total amount of sewage discharged through the Los Angeles system. "Los Angeles shall operate, maintain and keep in good condition and repair said sewage system, outfall sewers, treatment plant and ocean outlet therefrom for the term of this agreement." The term of the agreement shall be the life of the North Outfall Sewer. (As indicated above, Los Angeles had completed construction of this sewer in 1924; its permit to use this sewer was suspended in 1940 and revoked in 1943.)

Vernon did not perform its promises to pay $234,220 and $36,200 under the 1931 agreement. In 1937 Los Angeles filed two actions against Vernon, one for payments under the 1931 agreement and one for an injunction against discharging sewage into the Los Angeles system.

The 1938 agreement states that Los Angeles and Vernon desire to settle all controversies as to the prior agreements and to provide for future operation and maintenance of sewage disposal facilities. The right of Vernon to dispose of 11.7 cubic feet of sewage per second through the Los Angeles outfall sewers is acknowledged. Los Angeles agrees to sell and Vernon agrees to buy the right to dispose of an additional 4.3 cubic feet per second; for this right to dispose of additional sewage Vernon agrees to pay $112,885.45 by April 1, 1939, together with specified annual payments, until 1965, totaling $135,356.60; "in lieu of such annual payments, Vernon may . . . pay the then current worth of unpaid future annual payments, discounted at the rate of 3% per annum compounded annually." Vernon further agrees that if it exercises its right to dispose of sewage in excess of 11.7 cubic feet per second, it will pay its proportionate share, measured by the ratio of its sewage in excess of 11.7 cubic feet per second to the total flow of sewage through the Los Angeles outfall sewers and treatment plant, of the cost to Los Angeles of operation, repair, replacement, construction and reconstruction of the Los Angeles outfall sewers and treatment plant. The contract provides for dismissal of the 1937 actions instituted by Los An-

geles. There are additional provisions as to gauging stations, a relief sewer, and other matters which need not be set out. The agreement contains no provision as to its termination.

Vernon made the $112,885.45 payment provided for by the 1938 contract after it was due, with interest to compensate for the delay; it prepaid the annual payments as the contract provided it might do; Los Angeles accepted the payments in discharge of the obligations for which they were tendered.

■ The trial court in the present action determined that pursuant to the abatement injunction the lawful existence of the screening plant and the tube built pursuant to the 1923 permit has expired; that Los Angeles is required to build a new plant and tube at a cost of approximately $41,000,000; that the cost of operating and maintaining the new plant and tube will be approximately $500,000 per annum; that Los Angeles cannot continue performance under its contracts with Vernon "except at an excessive and unreasonable cost; that it is not practicable for the City of Los Angeles to continue the performance under the terms of the contracts . . . with the use of the new . . . plant and . . . tube."

The trial court in the present action further determined "That it was not intended by the plaintiff and defendant herein that the City of Los Angeles was obligating itself, under the terms . . . of the contracts heretofore entered into between said parties, to build . . . and operate large and extensive facilities or treatment works for the purification of sewage . . . ; that neither nor all [sic] of said contracts provide for, nor was it contemplated by either of the parties hereto in entering into said contracts, that the City of Los Angeles was or would be required under said contracts to erect . . . and operate a . . . treatment plant costing approximately $41,000,000 for the treatment of sewage arising within the boundaries of the City of Vernon."

The foregoing determinations of the trial court support the position of Los Angeles, succinctly stated in its brief, that "since further use of the facilities contemplated by the parties would be unlawful and the use of new facilities (ordered by the Court [in the abatement action]) would be unreasonably excessive in cost, further performance under said contracts by Los Angeles is excused."

■ The controlling principles as to legal impossibility excusing performace have been long recognized in this state and are stated in *Mineral Park Land Co.* v. *Howard* (1916), *supra*, 172 Cal. 289, 293, where defendants contracted to take gravel

from plaintiff's land at a certain price, and it was subsequently found that the gravel, although present, could be taken only at prohibitive cost: " 'A thing is impossible in legal contemplation when it is not practicable; and a thing is impracticable when it can only be done at an excessive and unreasonable cost.' (1 Beach on Contracts, § 216.) We do not mean to intimate that the defendants could excuse themselves by showing the existence of conditions which would make the performance of their obligation more expensive than they had anticipated, or which would entail a loss upon them. But where the difference in cost is so great as here, and has the effect, as found, of making performance impracticable, the situation is not different from that of a total absence of earth and gravel."

■■■ As we understand the composite contracts of the parties, and as is implicit in the trial court's findings, the parties contemplated that there would be available for legal use disposal facilities, whether those in existence or to be constructed, the cost of which would not be completely disproportionate to the costs expressly referred to in those contracts. Therefore, the case is not like the cases relied upon by Vernon where it was held that unforeseen hardship or unexpected expense did not excuse performance. (*Western Industries Co.* v. *Mason M. etc. Co.* (1922), 56 Cal.App. 355, 360 [205 P. 466]; *Orr* v. *Forde* (1929), 101 Cal.App. 694, 702 [282 P. 429]; see also *Lloyd* v. *Murphy* (1944), 25 Cal.2d 48, 55 [153 P.2d 47] ["laws or other governmental acts that make performance unprofitable or more difficult or expensive do not excuse the duty to perform a contractual obligation"].)

Vernon points to undisputed evidence that both before and after the parties entered into the 1938 contract officials of Los Angeles were concerned with and attempting to arrange for financing and construction of new sewage disposal facilities; such evidence, it says, shows that Los Angeles at the time of the making of the contract recognized and assumed the risk of the possibility that it would have to build expensive new facilities. Such a conclusional finding is not impelled as a matter of law. It is reasonable to believe that what was in the contemplation of the parties when they negotiated the 1938 contract was not the radical development of the 1943 abatement action but the working out of past and then existing difficulties without expense running into many millions.

Vernon asserts that "Plaintiff is entitled to an answer to the questions: 'If the contracts are invalid, *when* were they invalid? By what manner did they become invalid?' These are

the issues raised by the complaint and the answer—material issues—and should be answered one way or the other." The findings, conclusions, and judgment herein sufficiently resolve these "issues" by the determination that conditions were such, by the time the abatement judgment was entered, that performance of the contracts had become impracticable.

█ Despite the language that the contracts are "terminated" and "invalid," the effect of the judgment herein is not to determine that when performance by one party became impracticable the contracts were altogether abrogated regardless of what performances had already been rendered by either party. Such a determination would be incorrect. (See *Ogren v. Inner Harbor Land Co.* (1927), 83 Cal.App. 197, 199 [256 P. 607].) More accurately, the judgment determines that certain described "facilities and rights" created under the contracts (such as the gauging stations and relief sewer provided for by the 1938 contract) can and should be salvaged, and although the case was not tried in such a way that all obligations between the parties could be precisely adjusted by the judgment herein, such judgment expressly contemplates an adjustment of those obligations; it decrees that Vernon is liable to Los Angeles for any monetary obligations accrued under the contracts prior to the entry of judgment in the abatement action,[2] "provided, however, that if all the benefits received by her from the City of Los Angeles under all said agreements prior to the entry of said judgment in said State Abatement Action have had a fair value less than the total payments made by her and those now owing to the City of Los Angeles, she, Vernon, shall be credited with such excess of payments over such value of benefits received."[3]

---

[2] As stated, *ante*, p. 719, Vernon made and Los Angeles accepted payments which discharged the two principal monetary obligations under the 1938 contract. Whether Vernon made all other, lesser payments for various facilities and rights under such contract cannot be determined from the record herein.

[3] Concerning the subject of this declaration the trial court made the following statement in a memorandum opinion:

"The case [for declaratory relief] was not tried by either side on a theory that required presentation of evidence which would have enabled the court to make a financial adjustment between the parties. Hence, the court presently can only suggest a program that seems to be just, doing so with the understanding that the parties are free to work out an amicable adjustment at variance with the court's suggestions. In any such adjustment Vernon, it seems, should be charged with all payments accrued under the composite agreement up to the entry of judgment in the State Abatement Action, and, if up to that time the benefits received by her under the agreements had a fair value less than the total cost to her, she should be credited with the difference."

## Other Contentions

Vernon urges that the contracts were validated by the Municipal Sewer District Act of 1939 (Stats. 1939, ch. 24; Deering's Laws, 1939 Supp., Act 5192a). Section 4 of that act provided, ''All contracts made prior to the adoption and passage of this act between any two or more municipal corporations . . . providing for the joint construction, use or operation of sewer systems, or sewage disposal systems, are hereby ratified and confirmed . . .'' Since further performance of the contracts is excused because of conditions which arose subsequent to the 1939 act, we need not discuss the effect of that act or of other, previous laws as to sewage disposal contracts which are cited by Vernon.

■ Vernon's second cause of action is for damages in the amount which it is required to pay under the abatement judgment in return for its use of the Los Angeles disposal facilities. This cause of action is based on the theory that the negligent failure of Los Angeles to perform its contractual duty to keep its sewage disposal facilities in good condition and carry away the sewage of Vernon was the proximate cause of the abatement judgment against Vernon. Since performance of such duty was excused, the cause of action cannot be maintained.

Vernon asserts that the trial court's adjudication that it is not entitled to specific performance may be based upon determinations, which Vernon claims are erroneous, that it suffered no detriment commensurate with the benefits granted it under the contracts and that the consideration paid by it was disproportionately small as compared with the value of the obligations assumed by Los Angeles. The determination that further performance is excused is independent of determinations as to adequacy of consideration, and the latter subject need not be discussed.

In its petition for hearing by this court after decision of the District Court of Appeal Vernon asserted for the first time that the judgment of the trial court, if it is affirmed, will deprive Vernon of property without due process of law. This contention is but a variant of the argument, hereinbefore discussed and rejected, that since the making of the contracts there have been no developments which can excuse their further performance.

For the reasons above stated, the judgment is affirmed.

Gibson, C. J., Spence, J., and Bray, J. pro tem.,* concurred.

*Assigned by Chairman of Judicial Council.

CARTER, J.—I dissent.

I agree with the majority opinion that the trial court erred in concluding that the decree in the abatement action determined the issues raised in this action. I am further convinced, however, that the trial court erred also in concluding that Los Angeles is excused from performing its contractual obligations by reason of impossibility.

It is the general rule, so well established that it requires but token citation of authority, that the mere fact that performance of a promise is made more difficult and expensive than the parties anticipated when the contract was made, will not excuse the promisor from his obligation to perform his part of the contract. (*Metzler* v. *Thye*, 163 Cal. 95 [124 P. 721]; *Coulter* v. *Sausalito Bay Water Co.*, 122 Cal.App. 480 [10 P.2d 780]; Williston on Contracts (rev. ed.), vol. 6, § 1963; Rest., Contracts, § 467.) "Parties should be careful about making contracts, for once made the courts will not relieve them for light or trivial reasons. Public policy is subserved by leaving the parties and their rights to be measured by the terms of their engagements. (*California Cured Fruit Assn.* v. *Stelling*, 141 Cal. 713 [75 P. 320].) They may have made an unfortunate arrangement, but when they have entered into it voluntarily, they are bound by it in the absence of equitable grounds for avoidance. (*Cook* v. *Snyder*, 16 Cal.App.2d 587 [61 P.2d 53].) They must be presumed to have contracted with reference to existing conditions known to them. (*Dore* v. *Southern Pac. Co.*, 163 Cal. 182 [124 P. 817].) A person contracting with eyes open and aware of the facts is presumed to undertake performance at the risk of interference from agencies not expressly provided against. (*McCulloch* v. *Liguori*, 88 Cal.App.2d 366 [199 P.2d 25].) Moreover, contracting parties cannot escape performance of their undertakings because of unforeseen hardship. (*Metzler* v. *Thye*, 163 Cal. 95 [124 P. 721].) " (12 Cal.Jur.2d, Contracts, § 226.) Applied to factual situations analogous to that presented here, the rule has been stated that laws or other governmental acts that make performance unprofitable or more difficult or expensive do not excuse the duty to perform a contractual obligation (*Aristocrat Highway Displays* v. *Stricklen*, 68 Cal.App.2d 788 [157 P.2d 880]; *Western Industries Co.* v. *Mason M. etc. Co.*, 56 Cal.App. 355 [205 P. 466]; *McCulloch* v. *Liguori*, 88 Cal.App.2d 366 [199 P.2d 25]; *Lloyd* v. *Murphy*, 25 Cal.2d 48 [153 P.2d 47]; *Sample* v. *Fresno Flume etc. Co.*, 129 Cal. 222 [61 P. 1085]; *Klauber* v. *San Diego Street Car Co.*, 95 Cal. 353 [30 P. 555]).

Looking at the present factual situation, we note that a governmental act—the abatement action—has caused Los Angeles to make certain expenditures, and has made performance by Los Angeles of its contractual obligations more expensive. Applying the general rule to this factual situation, we would conclude that Los Angeles is not excused from performing its contractual obligations, and that Los Angeles therefore has no right to retain all of the payment made by Vernon under court order to help finance the construction of a facility whereby Los Angeles may legally perform its contractual obligation.

The rule has developed in modern times that supervening impossibility will, in proper cases, excuse a promisor's failure to perform. Unusual or unexpected expense does not establish impossibility of performance. (*Metzler* v. *Thye*, 163 Cal. 95 [124 P. 721]; *Glens Falls Indem. Co.* v. *Perscallo*, 96 Cal.App.2d 799 [216 P.2d 567].) Failure to perform may be excused, however, when the added cost is so great as to have the effect of making performance impracticable. In legal contemplation a thing is impossible when not practicable, and a thing is impracticable when it can be done only at an excessive and unreasonable cost (*Mineral Park Land Co.* v. *Howard*, 172 Cal. 289 [156 P. 458, L.R.A. 1916F 1]).

The following characteristics should be particularly noted in regard to this defense of legal impossibility: First, it operates to excuse a nonperforming obligor from liability for his failure to perform. Second, it operates only when performance of the obligor's part of the contract is impracticable. Third, the unanticipated expense which will render performance impracticable must be very much greater (in the Mineral Park case it was 10 or 12 times greater) than the expected or usual cost of performance. With these characteristics in mind, it is evident that the majority opinion has erred in supporting the trial court's judgment on the basis of legal impossibility.

Among the contractual obligations of Los Angeles, which the majority opinion says are excused, is a duty to accept at designated places, and to dispose of a specified quantity (up to 16 cubic feet per second) of sewage from Vernon. It should be noted that this duty was performed by Los Angeles up until the time of commencement of this action; it is presumably being performed by Los Angeles while this case is pending in the courts; and it will assuredly be performed in the future, after a decision is rendered in this case. It is obvious, then, that the doctrine of legal impossibility

as here applied by the majority does not excuse an obligor from liability for failure to perform a contractual duty; instead that doctrine is employed by the majority to rewrite the contract between these parties. Los Angeles will continue to perform the services which it undertook to perform by this contract; Vernon will continue to dispose of its sewage at designated points on the Los Angeles outfall sewer; but Vernon, the obligee, will be required to pay more money, now and in the future, for this continuation of performance of the contractual obligations of Los Angeles.

I am aware of no prior decision of this or any other court in which the doctrine of legal impossibility has been applied to increase the consideration to be paid by the promisee while recognizing that the promisor will continue to perform as before. By the same token, I can find neither law nor logic to support a decision which terms "impracticable" or "impossible" of performance, a contract which both parties and this court recognize as having been performed and is expected to be performed for an indefinite period in the future. This situation comes as near approaching a legal paradox as any which has come under my observation.

As an additional matter, careful examination of the record in this case raises a question as to whether the cost of performing the contract, using the new facilities, is substantially disproportionate to the anticipated cost of performance. The majority opinion refers to certain payments made by Vernon to Los Angeles. The total sum which Vernon had paid up to the time of trial for the use of the facilities of the Los Angeles sewer system was $296,801.50, in addition to the granting of flowage rights through Vernon. The majority opinion then refers to the trial court's finding that Los Angeles is required to build a new treatment plant and tube at a cost of about $41,000,000, and that operation and maintenance of these facilities will cost about $500,000 per year. But these figures, juxtaposed in the majority opinion, are misleading. The figures "$41,000,000" and "$500,000" have but slight bearing on the cost to Los Angeles of performing its contractual obligation to Vernon.

If this were a proper case for application of the doctrine of legal impossibility (if Vernon were seeking damages for a refusal by Los Angeles to accept any sewage from Vernon), the figure which would be computed to determine whether performance was unreasonably or excessively expensive would be the increased cost of performing this contract. Presumably

the cost of performance before the advent of the abatement action was not disproportionate to the approximately $300,000 consideration paid by Vernon. To compute the increase in cost, one must recognize the additional facts that Los Angeles is building a sewage disposal plant with capacity for 260 million gallons per day; that 10 million gallons per day of this capacity is allotted to Vernon. If the plant were designed and constructed without allotment of gallonage to Vernon, it would still have capacity for 250 million gallons per day. The increased cost of performing the contract is the difference in cost of construction between a 260-million-gallon per day plant and a 250-million-gallon per day plant. What this difference would be is impossible to determine from the record before us. It requires no engineer, however, to deduce that the cost of construction would not increase in direct proportion to the increase in capacity; the structural differences between a 250-million-gallon per day plant and a 260-million-gallon per day plant would presumably be slight. It is clear, at any rate, that the increase in cost attributable to making the plant large enough to take care of Vernon's sewage, and thus the increased cost of performing the Vernon sewage contract, would not be 10 or 12 times as great as the approximately $300,000 which it would have cost to perform the contract if the abatement action had not intervened.

Another point on which I am convinced the majority opinion is in error relates to Vernon's second cause of action, on the theory of negligence. The majority opinion states: "Vernon's second cause of action is for damages in the amount which it is required to pay under the abatement judgment in return for its use of the Los Angeles disposal facilities. This cause of action is based on the theory that the negligent failure of Los Angeles to perform its contractual duty to keep its sewage disposal facilities in good condition and carry away the sewage of Vernon was the proximate cause of the abatement judgment against Vernon. *Since performance of such duty was excused, the cause of action cannot be maintained.*" (Emphasis added.)

On this point the majority opinion appears to be inconsistent with itself. It is beyond dispute that a negligence action may be predicated on the breach of a duty arising out of contract. (*L. B. Laboratories, Inc.* v. *Mitchell*, 39 Cal.2d 56 [244 P.2d 385].) If the breach which causes the damage and gives rise to the cause of action occurs while the contractual duty is subsisting, can plaintiff's right to maintain a cause of action for that breach be destroyed by

the later occurrence of events which are held to excuse the performance of the duty? Obviously not.

The main theory of the majority opinion is that Los Angeles' performance of duties under the contracts is excused because of excessive or unreasonable expense occasioned by the decree in the abatement action. But Vernon seeks relief by way of damages for the alleged negligent operation of the sewage disposal facilities which brought about the abatement action. In other words, Vernon alleges a breach of contractual duties by Los Angeles before the existence of the conditions which are held in the majority opinion to excuse performance of those duties. Clearly the breach of duty alleged by Vernon in its second cause of action is a sufficient basis for maintenance of that cause of action even if the majority opinion were correct in holding the duty to be later excused. In other words, it was a breach of duty on the part of Los Angeles which brought about the condition on which its defense of impossibility of performance is predicated.

The pleadings relating to the second cause of action raised the issues (1) whether Los Angeles owed a contractual duty to maintain the old treatment plan and ocean outlet in good repair; (2) whether Los Angeles breached that duty by negligence, carelessness and mismanagement in the operation and maintenance of the treatment plant and ocean outlet; and (3) whether such breach, if any, was the direct and proximate cause of damage to Vernon. Much of the testimony in the trial court related to these issues. The failure of the trial court to make direct findings on these issues was prejudicial error. (*Baggs* v. *Smith,* 53 Cal. 88; *Taylor* v. *Taylor,* 192 Cal. 71 [218 P. 756, 51 A.L.R. 1074]; *Strong* v. *Strong,* 22 Cal.2d 540 [140 P.2d 386]; *Elliott* v. *Bertsch,* 59 Cal.App.2d 543 [139 P.2d 332]; *Mayer* v. *Beondo,* 83 Cal.App.2d 665 [189 P.2d 327, 190 P.2d 23]; *Chamberlain* v. *Abeles,* 88 Cal. App.2d 291 [198 P.2d 927]; *Flennaugh* v. *Heinrich,* 89 Cal.App.2d 214 [200 P.2d 580].)

The trial court's finding of fact relative to the second cause of action reads as follows: "Insofar as the allegations of paragraphs III, IV, V and VI of said second cause of action purport to assert any present obligation of the City of Los Angeles, or any present right of the City of Vernon, arising from any or all of the aforesaid contracts and/or from any conduct on the part of the City of Los Angeles, each of said allegations is untrue. It is not true that any

negligence and/or carelessness or other conduct of the defendant was the proximate cause of the judgment entered against Vernon in said State Abatement Action, or of the order of the court which, in effect, required Vernon to pay the sum of $901,250.00 or any other sum as its proportionate share of the new treatment plant and/or submarine outfall and/or any other facility for sewage disposal, which said judgment required the City of Los Angeles to construct; and it is not true that plaintiff will be damaged in said or any sum by compliance with the orders or any order of said judgment. To the contrary, plaintiff has been benefited by the compliance with said judgment on the part of the defendant, and plaintiff has been and will be benefited by said compliance to an extent greater in fair monetary value than the total of all sums which she, Vernon, has been or will be required by said judgment to pay.''

This finding does not purport to deal with the issue of a contractual duty owed by Los Angeles to Vernon during the period prior to the judgment in the abatement action. There is no finding on the factual question whether Los Angeles breached its contractual duty. The finding that Vernon will not be damaged by compliance with the abatement judgment, but will instead be benefited, is obviously based on the trial court's erroneous conclusion that Los Angeles is excused from performing the contract. If Vernon is required to pay for a service which Los Angeles is contractually bound to render, obviously Vernon will be damaged to the extent of the value of the service, which damage was suffered by Vernon as the result of the failure of Los Angeles to perform its contractual duty by operating its sewage disposal facilities in such a manner as to create a public nuisance which necessitated the abatement action. It should be noted that Vernon had no power to control the manner of operation of the disposal facilities.

In my opinion Los Angeles should be held to the terms of the contract which it made with Vernon. Vernon's contractual right to flow 11.7 cubic feet per second of sewage into the Los Angeles sewer system without further payment should be upheld. Vernon should have the further right to flow an additional 4.3 cubic feet per second of sewage into the Los Angeles sewer system, subject to payment of a proportionate share of the sewage disposal cost as provided in the contract. Los Angeles should be ordered to return to Vernon so much of the payment made by Vernon pursuant to the decree in the abatement action as is attributable to

the 16 cubic feet per second flow which Los Angeles is contractually bound to accept.

For the reasons above stated I would reverse the judgment.

Traynor, J., concurred.

Appellant's petition for a rehearing was denied January 5, 1956. McComb, J., did not participate therein. Bray, J. pro tem.,* participated therein in place of Shenk, J. Carter, J., and Traynor, J., were of the opinion that the petition should be granted.