CITY OF NEW BRUNSWICK, PLAINTIFF, v. BOROUGH OF MILLTOWN AND THE MIDDLESEX COUNTY SEWERAGE AUTHORITY, DEFENDANTS.

Superior Court of New Jersey
Chancery Division Middlesex County

Decided February 18, 1983.

468

*John J. Degnan* for plaintiff (*Shanley & Fisher,* Attorneys).

*Arnold K. Mytelka* for defendant, Borough of Milltown (*Clapp & Eisenberg,* attorneys).

*Anne S. Babineau* for defendant, Middlesex County Sewerage Authority (*Wilentz, Goldman & Spitzer,* attorneys).

COHEN, J.S.C.

In 1914 New Brunswick and Milltown entered into a contract that provided, in part, for the free disposal by New Brunswick of Milltown's sewage. In this suit New Brunswick seeks a judgment terminating its duty to perform the contract.[1] This is

[1]New Brunswick also joined Middlesex County Utilities Authority as a defendant. The Authority denied any right to effectively deal with the intermunicipal contract but generally supports the city's position. It seeks an order requiring Milltown to adopt a sewer user charge ordinance satisfying the requirements of federal regulations. It also filed a third-party complaint against the Environmental Protection Agency. EPA removed to the Federal District Court, 28 *U.S.C.* § 1442(a)(1), and counterclaimed for a declaration that it was properly withholding grant funds from the Authority, in part because of Milltown's not having adopted a sewer user charge ordinance.

not the first time New Brunswick has sought relief from its continuing obligations under the 1914 agreement. Its efforts have been uniformly unsuccessful. *See New Brunswick v. Milltown,* 135 *N.J.Eq.* 310 (Ch.1944); *Milltown v. New Brunswick,* 138 *N.J.Eq.* 552 (Ch.1946), rev'd 140 *N.J.Eq.* 565 (E. & A.1947); *New Brunswick v. Milltown,* 3 *N.J.Super.* 113 (App.Div.1949).

I hold that New Brunswick should now be discharged of the duty to dispose of Milltown's sewage without compensation. I do so because it would be inequitable to require New Brunswick to perform a contract made 69 years ago whose burdens have radically and significantly increased in ways never contemplated by the parties. I do so also because there is no longer any consideration of any consequence flowing from Milltown and because its past consideration is insufficient to require New Brunswick's continued performance. I do so also because the existence of the contract significantly impedes New Brunswick's ability to obtain and participate in necessary financing of regional and local sewage transmission and treatment facilities. This impediment further burdens New Brunswick in significant ways never contemplated by the parties.

A review of the history of this matter is necessary. Much of the below recital is taken from the prior reported opinions. The rest represents facts proven to my satisfaction in the hearing before me. Those facts fill interstices and describe the situation as it has developed since 1949. They do not conflict with the findings of earlier courts.

## Background of the Contract

New Brunswick is a city on the south side of the Raritan River. In 1910 its population was 23,388. The Borough of

---

The District Court so declared and remanded the matter here for determination whether the viability of the New Brunswick-Milltown contract was affected by the existence of federal grant requirements. *New Brunswick v. Milltown,* 519 *F.Supp.* 878 (D.N.J.1981). The Court of Appeals affirmed 686 *F.2d* 120 (3 Cir.1982). Petitions for *certiorari* have been made to the United States Supreme Court.

Milltown is to the southwest, separated from the city by a narrow area of North Brunswick. Its 1910 population was 1584. In those years Milltown drew its water from local wells. It disposed of its sewage by means of individual septic facilities and by discharging into Lawrence Brook, a stream that flowed through Milltown. Water pollution problems came to the attention of the State Board of Health, which issued complaints to Milltown property owners and ordered the borough to take remedial measures. A major problem was that raw sewage was running into Lawrence Brook as it flowed on its way downstream to Weston's Mill Pond, a body of water from which New Brunswick drew its drinking water.

Milltown's solution was to plan to build a system of local sewage collectors and a treatment plant. The plant was designed by Clyde Potts in 1912 to consist of holding facilities to permit the settling of suspended solid matter, the passage of liquids through sand filtration beds, and an ultimate discharge of liquid effluent into Lawrence Brook upstream of Weston's Mill Pond. The plant was modern for its time, but 1912 was a time of innocence in matters of waste water treatment.

In order to build the Potts-designed facility, Milltown had to gain approval of the State Sewer Commission. New Brunswick appeared at the Commission hearings to object to the facility and to express its fear of the effect on the Weston's Mill water source. With the encouragement of the Commission, the two municipalities reached an agreement whose principal purposes were to preserve the potability of Weston's Mill water for New Brunswick and to accommodate Milltown's obligation to dispose of its sewage properly.

### The 1914 Contract

The parties' agreement is not a complex one. Milltown agreed that it and its residents would not discharge polluted water into Lawrence Brook; that it would not build the planned sewage treatment plant and that, instead, it would build a

system of local collectors and a 12″-diameter force main through North Brunswick to deliver its sewage to the New Brunswick sewerage system. New Brunswick promised to pay $12,500 toward Milltown's construction costs.[2] The agreement also provided:

SECOND: That it will take charge and dispose of all sewage received from the Borough of Milltown through the twelve inch force main to be constructed under the sewer system adopted by said Borough from the time that the same reaches the sewerage system of the City of New Brunswick, ...

THIRD: That it will dispose of all sewage so received from the Borough of Milltown in the same manner as its own sewage.

The agreement does not say that New Brunswick's disposal of Milltown's sewage would be free of charge. But that is certainly what the parties meant. In 1914 New Brunswick charged no one for sewage disposal. It was 30 years before New Brunswick began charging its local properties for sewage disposal. And, until that time, the city made no effort to charge Milltown.

## The First 30 Years

The science of sewage and waste water disposal was in its infancy in 1914. Most sewage was discharged raw into water courses. Treatment methods were crude and only partially effective. Settlement and mechanical filtering were used. The disinfecting of effluent was known but not widely done. Combined storm and sanitary sewers were common, and, in times of rain and surface water runoff, overtaxed treatment plants became virtually ineffective.

But, the law prohibited pollution and, in a tentative and ineffective way, it was beginning to be enforced. The occasion for Milltown's 1912 plans was the action of the State Board of Health. By 1914 the Board had already sought a Chancery order requiring New Brunswick to cease pollution of the Raritan River. The problem was that New Brunswick discharged its

---

[2]The evidence does not reveal what part of the costs were covered by the $12,500 payment.

residential and industrial wastes, raw and untreated, into the river. After 1914 it added Milltown's contribution to its own. Despite state agency efforts through the 1920s and early 1930s, New Brunswick began to treat its sewage only in 1937, after it was enjoined from discharging untreated sewage into the river. The city's new plant provided advanced primary treatment by permitting settlement of solids and then disinfecting the effluent by chlorination before discharge into the river. State enforcement efforts in nearby municipalities were also having their effect, and soon the Raritan River basin was dotted with local, partly effective, primary treatment plants. They were better than nothing.

During these years scientific knowledge of the need for and the means of accomplishing effective sewage treatment was growing. In its wake followed steadily upgraded state standards for treatment and disposal. In 1938 the State Department of Health adopted a policy establishing minimum kinds of treatment for new plants to be built thereafter. In 1941 a new policy statement established, for the first time, minimum standards for effluent quality that applied to both new and existing plants. New Brunswick did not comply with the 1941 standards. Few municipal treatment plants did, but the country was entering World War II and its attention and resources were soon directed elsewhere.

By 1950, when the State Department of Health next upgraded its policy, it set minimum effluent standards for local treatment that were out of the reach of New Brunswick's and every other Raritan Valley treatment plant's capabilities. The State had decided to push for regional collection and treatment.

### The Litigious 1940s and The Doctrine of Res Adjudicata

In February 1942 New Brunswick brought suit in Chancery, seeking to have the 1914 agreement set aside. *New Brunswick v. Milltown*, 135 *N.J.Eq.* 310 (Ch.1944). It argued that (1) the agreement was *ultra vires*, (2) the agreement contemplated only

discharging of raw sewage into the river, which was no longer permitted, and (3) the agreement was against public policy in that it imposed a perpetual obligation. New Brunswick asserted that its cost of treating Milltown's sewage was $1,500 a year and that increasing flows in both municipalities overtaxed the treatment facilities.

Vice-Chancellor Stein ruled for Milltown. He held that the agreement was not *ultra vires* or against public policy and that treatment of both New Brunswick's and Milltown's sewage was contemplated by the parties in 1914. The State Board of Health had by that time already ordered New Brunswick to cease discharging untreated sewage. The city knew that eventually it would have to comply.

As to increased costs, the court said:

That the agreement thus entered into now entails greater expense and renders performance of the same more burdensome to the complainant than contemplated at the time it was made is not a sufficient ground for relief by way of cancellation. [at 314]

Despite the 1944 Chancery decree, New Brunswick's governing body passed a resolution in February 1945. It purported to terminate the 1914 contract as of May 31, 1945 and provided for a charge of $35 per million gallons to be charged to the borough. That charge appears to have exceeded the schedule for sewer charges initiated by the city in 1944 for local sewer users. When Milltown failed to pay for June and July 1945, New Brunswick brought an action for $378 in the Middlesex County District Court. (New Brunswick's annual charges, if June and July were typical months, would have been $2,268). Milltown went to Chancery and obtained an injunction against the district court action. *Milltown v. New Brunswick,* 138 *N.J.Eq.* 552 (Ch.1946). On appeal the Court of Errors and Appeals reversed. It held that the issue of the terminability of the 1914 agreement was not foreclosed by prior litigation from consideration in the district court and that therefore the injunction should not have been granted. *Milltown v. New Brunswick,* 140 *N.J.Eq.* 565 (E. & A.1947).

In his opinion supporting the injunction, Vice-Chancellor Stein seemed annoyed that New Brunswick should attempt to skirt his earlier validation of the 1914 agreement. He dealt with New Brunswick's assertion that the doctrine of *res adjudicata* was not conclusive as to a question of law. He ruled that where there was an identity of parties, cause of action and subject matter, a prior decree in equity would serve to bar relitigation in the law courts of issues already determined in equity. The reversal of his decree by the Court of Errors and Appeals did not represent a disagreement with the vice-chancellor's statement of the law. Rather, the high court decided, by a 8–6 vote, to permit litigation of matters it saw as not previously decided between the parties.

Back to the district court went the parties where a judgment was entered in favor of the city, apparently on the thesis that its abrogation of the 1914 agreement was legally effective. On appeal, the Appellate Division reversed. *New Brunswick v. Milltown,* 3 *N.J.Super.* 113 (App.Div.1949). In upholding the continued viability of the contract, it made two significant rulings. In answer to New Brunswick's complaint that its obligation was perpetual and quantitatively unlimited, the Appellate Division held that (1) the duration of the contract was not perpetual but was dependent upon New Brunswick's continued use of Lawrence Brook for its potable water source, and (2) the limit of New Brunswick's obligation was the capacity of the 12-inch force main, a limit the court did not attempt to measure.

The Appellate Division opinion was noticeably silent on two matters. First, it did not say what issues were foreclosed by the doctrine of *res adjudicata.* Second, it made no reference to any attempt by the city to prove an increase in its costs. The opinion does, however, mention the concept of material change in circumstances. It quotes and adopts the language of the Ohio Court of Appeals in *City of Cleveland v. Village of Cuyahoga Heights,* 81 *Ohio App.* 191, 75 *N.E.2d* 99 (1947):

> It maybe that some time in the future new conditions may arise; . . . . If such or any similar situations should develop the parties may then seek a further

determination of the rights and liabilities under such materially changed conditions. [75 *N.E.2d* at 104]

The Ohio court was focusing on matters of continued benefit to the burdened party and changes in the relationship between the parties. Its language, however, speaks more broadly than that, and the Appellate Division chose to adopt it.

I would be faced with serious *res adjudicata* problems if New Brunswick sought relief now on the thesis that the 1914 contract was *ultra vires* or invalid because perpetual, or that a reasonable time for performance had already passed, or that there had been an increase in Milltown's effluent flow, or that the city now had to treat Milltown sewage instead of merely transmitting it raw to the Raritan River, or that treatment cost some $1,500 a year. Each of those matters has already been considered in prior cases and each was rejected as a basis for invalidating the 1914 agreement. But the Appellate Division did say that "materially changed conditions" would justify a future look at the rights and liabilities of the parties. And, even if one or another facet of current conditions has been rejected as an individual predicate for relief in the past, I must recognize its existence in order accurately to measure whether the total impact of current conditions has changed in ways material to the parties' obligations under their agreement. *Cf. Plainfield v. Public Service Electric and Gas Co.*, 82 *N.J.* 245 (1980).

## To The Present

After World War II public attention could refocus on pollution and waste problems in the Raritan valley. Municipal facilities offering primary sewage treatment had been proved incapable of dealing with the growth in population and industry in the area. Once a source of food and recreation, the Raritan had become a running sewer, in which fish and plant life had all but disappeared. Efforts accelerated to end gross industrial pollution of the river. In 1950 the New Jersey Department of Health set effluent standards that local existing plants could meet only if they very extensively upgraded treatment facilities

and methods. The new effluent standards for regional plants were set at less rigorous levels, however, in an obvious effort to persuade industries and municipalities to abandon their own facilities and join in the creation of a regional solution to the problem.

In 1951 Elson T. Killam Associates and Metcalf & Eddy, two qualified and experienced firms in the fields of hydraulic and sanitary engineering, issued a detailed report on pollution in the Raritan River basin. They reported that not one of the 18 local plants in the area met 1950 effluent standards. They estimated the high costs of upgrading the local facilities and recommended construction of regional collection and treatment.

In 1950, pursuant to recent enabling legislation, the Middlesex County Sewerage Authority was formed. *N.J.S.A.* 40:14A–1 *et seq.*[3] Participating industries and municipalities met frequently with the Authority and hammered out a comprehensive contract fixing their rights and obligations. Final arrangements were made in 1954. Construction began and a giant network of collection facilities soon ran the length of the Raritan and along the tributary South River. A primary treatment plant was built near Raritan Bay in Sayreville and, by 1958, the system was in operation and the participants began to pay the Authority according to an agreed schedule of fees. *Middlesex Cty. Sewerage Auth. v. Middlesex Borough,* 74 *N.J.Super.* 591 (Law Div. 1962), aff'd o.b., 79 *N.J.Super.* 24 (App.Div.1963).

Milltown did not become a participant. Its 1914 arrangements with New Brunswick had recently been confirmed by the courts. As a nonparticipant, Milltown was able to avoid not only any capital costs of connection and the imposition of Authority fees but also the other long-term obligations assumed by the signers of the 1954 contract. One of them was the

---

[3]The Authority subsequently became a utilities authority. It is now called Middlesex County Utilities Authority and operates under *N.J.S.A.* 40:14B–1 *et seq.*

promise by each participating municipality "that it will adopt a system of user charges and industrial cost recovery which, at a minimum, complies with the rules and regulations of the EPA." The problem created by that language arose when the Environmental Protection Agency required, as a condition of federal grants for construction of collection and treatment facilities, that contributors distribute the burden of local costs in a specified manner by means of a sewer user charge ordinance. But that became a problem only in the 1970s, when the Authority was in a second major construction program.

In the years after 1958 the Authority provided primary treatment for most of the Raritan valley. Facilities seemed adequate and fees were not troublesome. The Authority began to plan to increase the capacity of its transmission lines to meet greater flows and to upgrade its facilities to provide secondary treatment. The feasibility of the projects depended completely on federal and state funding of most of the hundreds of millions of dollars of cost. The funding was secured. Increases in charges to participants must have been contemplated, but the Authority members, who represented varied local and industrial constituencies in the area, apparently thought the cost would be tolerable and worthwhile. At the same time, other developments dramatically increased the cost of Authority operations. Sewage disposal uses large amounts of energy. Increases in energy costs that started in the mid-70s required startling increases in the Authority's rates.

To measure the present burden on New Brunswick of fulfilling its 1914 promise, and compare it with the conditions last judicially considered in the late 1940s, it is necessary to look at some numbers.

In 1950 New Brunswick's total sewage flow, including Milltown's, was 3,400 million gallons a year (mgy). Milltown's contribution was 235 mgy, or about 7%. It cost New Brunswick something around $1,500 a year to treat Milltown's flow. Total city current expenses, excluding debt service, for sewerage

operations and maintenance, was about $150,000. If the city billed Milltown in the same manner as it did its industrial customers, the 1950 bill would have been $6,232.

In 1982 New Brunswick's total sewage flow, including Milltown's, was about 4,437 mgy. Milltown's contribution was some 384 mgy, or about 8.6%. New Brunswick paid the Authority some $95,000 to treat Milltown's flow. Total city current expense, excluding debt service, for sewerage operations and maintenance, was estimated to be some $2.2 million, after deducting a subsidy payment made to the Authority on the city's behalf by the board of chosen freeholders. If the city had billed Milltown in the same manner as it did its industrial customers, the 1982 bill would have been greater than $300,000. A fair share of current city costs that New Brunswick says are attributable to Milltown is more than $250,000.

Milltown challenges the city's flow quantity estimates and cost comparisons, but it raises no substantial reason to distrust the gross results of the city's analysis. The estimate of 384 mgy flow from Milltown is modest. It results from a six-week temporary flow-metering program and a conservative treatment of every possible variable. It is minimally higher than the 357 mgy calculated by using two standard rule-of-thumb methods of estimating such matters. It is somewhat below the 428 mgy estimate of flow announced by Milltown's mayor in 1976.

On cost comparisons, Milltown points out the sharp decline in the dollar's value. It is correct that comparison must be made between a single 1950 dollar and 3.8 current dollars. Milltown's other arguments, however, are not convincing. It argues that comparison of current costs should be made with the costs that New Brunswick would have incurred in 1950 if it had been in compliance with state treatment and effluent standards. But the city was in fact out of compliance and so was every other local treatment facility. And the State was engaged in encouraging the abandonment of local plants by setting rigorous standards that would be prohibitively costly to meet. Thus, to

compare the real worlds of 1950 and 1982, one must compare the costs the city actually incurred. Also, Milltown argues that cost comparisons should be made on the thesis that Milltown's flows had not increased since 1950. Only by doing that, the argument runs, can one avoid running afoul of the prior binding ruling that mere increase in Milltown's flow, within the capacity of the 12-inch force main, is insufficient grounds for relief. The difficulty is that flows have, in fact, increased, and one can consider the actual impact of the burden of New Brunswick's contract performance only by dealing with real current and historical conditions and not by dealing with artificial constructs. Although relief may not be afforded merely for quantity increase, one is not free to ignore the fact that it has occurred.

Milltown does raise one troublesome question about what costs should be considered in properly measuring New Brunswick's burden. It is undisputed that New Brunswick's sewerage costs include both its own operations and maintenance costs and the charges made by the Authority. It is also plain that, of New Brunswick's total flow of 4437 mgy, some 2,800 mgy is either from Milltown or billable to other sources, including local properties, according to quantity and quality of effluent. An additional 1,637 mgy is unbillable, because it comes either from ground water infiltration or storm water inflow or unknown tie-ins.[4] New Brunswick distributes the burden of the unbillable flow to all the billable users, except one specially billed municipal customer, according to flow quantity.

---

[4] New Brunswick's infiltration and inflow are high. There are two reasons. First is that in its extensive old neighborhoods are many old collector lines with joint failures and other sources of ground water infiltration. Second is that substantial areas of the city's original collector system were combined with its storm water collection system. That made sense when the lines' purpose was solely to direct their contents to the river. Today, however, the Authority flow charges do not distinguish between sewage and rainwater. For that reason New Brunswick is in the midst of a sewerage system separation program.

New Brunswick takes the position that its own costs of $300,000 a year ought to be attributed on a flow quantity basis to all effluent contributors. It also argues that every collection system must fairly distribute the costs of unbillable flow to its customers. Therefore, part of the city's burden of serving Milltown lies in its inability to assign an equitable part of those unbillable costs to Milltown. Milltown's ratable share of the combined annual costs of city operations and maintenance and unbillable flow exceeds $160,000. Therefore, the city argues, that amount should be added to the Authority's charges for Milltown's flow of $95,000 to reach a fair estimate of New Brunswick's burden of $250,000.

Not so, says Milltown. New Brunswick's burden is only the incremental cost that Milltown's flow imposes on the city, *i.e.*, the Authority's charges for accepting Milltown's effluent. If Milltown were shut out, the city's operations and maintenance would go on, just as before, without savings. Similarly, without Milltown, New Brunswick would have the same unbillable infiltration and inflow and would have to assign the cost in some equitable way to its paying customers.

There are two fallacies in Milltown's position. The first is that its analysis of the costs it contributes applies equally well to every sewage contributor to New Brunswick's system. The elimination of any one of them would leave behind essentially the same costs of operation and maintenance and essentially the same unbillable flows. No one sewer user can fairly be treated as an imposer only of incremental costs. Unless each one is also assigned a fair share of common costs, no one has responsibility for them.

The second fallacy is that Milltown's position is factually wrong. There are no proofs before me one way or the other, but it must so that Milltown's contribution of more than a million gallons of sewage each day has an impact on the cost of current operations, for repairs, for maintenance, for monitoring, record keeping and the like. Flow contribution may not be a

perfect measure of cost contribution, but it is not a bad guide-
line. New Brunswick's current expenses of $300,000 cannot
sensibly be attributed to Milltown much less than in the ratio
that its flow bears to total New Brunswick flow, or 8.6%. Thus,
its portion of the local cost is at least $25,000. But beyond that,
it is not at all clear that Milltown's flow of billions of gallons
over the years into the Mile Run Interceptor, a line through the
city to the Raritan that must have been sized for Milltown's
flow, did not have some contributing effect on construction,
maintenance and repair costs, and even on the amount of
infiltration into the line.

On any basis, then, it is fair to measure the costs Milltown
contributes to New Brunswick's sewerage cost burden, not by
Authority charges alone, but also by an analysis that assigns to
Milltown a fair share of common costs. Everyone cannot simul-
taneously seize the comfortable position of the last incremental
cost contributor. New Brunswick's argument is sound, that
Milltown's fair share of New Brunswick's annual sewerage costs
approximates $250,000.

Whether the city's costs to perform its contract with Milltown
are properly considered to be $95,000 or $250,000, or something
in between, those costs are grotesquely disproportionate to those
the parties originally contemplated. Those costs may not be so
high as to render the contract impossible of performance. *Cf.
Newark v. North Jersey Water Supply Comm'n*, 106 *N.J.Super.*
88 (Ch.Div.1968), aff'd o.b. 54 *N.J.* 258 (1969). Nevertheless,
when costs of performance skyrocket in unpredictable ways to
unreasonable levels, further performance of contracts like the
subject one should be excused. *City of Vernon v. City of Los
Angeles*, 45 *Cal.2d* 710, 290 *P.2d* 841 (1955); *Kansas City, Mo. v.
Kansas City, Kan.*, 393 *F.Supp.* 1 (W.D.Mo.1975).

### Consideration

In return for New Brunswick's 1914 promise of free sewage
disposal, Milltown created a collector system and a force main

through North Brunswick. It refrained from building the Potts treatment plant. It refrained from discharging waste into Lawrence Brook. It guaranteed New Brunswick its source of potable water.

Milltown argues that, in addition, it gave up the opportunity to deal favorably with the Authority in the 1950s and, in general, to follow a destiny independent from New Brunswick. Further, it continues to refrain from discharging into Lawrence Brook.

The borough, in fact, gave little and gained much. It built a collector system that, in any event, it had to build. Its force main cost something, but how much more than $12,500 is hard to say. The treatment plant it did not build was of a kind soon outdated, expensive to operate and ineffective in wet or freezing weather. Its chances of practical upgrading to modern standards would not have been good. One small local municipality still has a similar plant. It is under state orders to discontinue its use. Until that time, it may not lawfully permit any new sewer extensions to be made. If Milltown had been under such restrictions in recent years, its residential growth could not have taken place.

Any discharge from Milltown in recent years into Lawrence Brook would probably be prohibited by more stringent statutory and regulatory law. Tertiary treatment would be required of an upgraded Potts plant, a highly costly and likely unattainable level of performance. Construction of new sewerage facilities on Lawrence Brook would have little chance of gaining state approval.

In addition, Weston's Mill is now only an auxiliary source of water for New Brunswick. Its main source is the Delaware and Raritan Canal, with Weston's Mill serving only in periods of hot-weather excess demand. Not only, therefore, is Milltown's nondischarge into Lawrence Brook now independently prohibited by law but New Brunswick's use of downstream water has greatly diminished.

If Milltown were not tied to New Brunswick, it argues, it could have made a good bargain with the Authority in the 1950s. For that reason, Milltown having relied on its contractual rights with New Brunswick's knowledge, the city should be estopped from now repudiating its duties.

The facts are all the other way. If Milltown had made a direct tie-in to the Authority, it would have had construction expenses. More important, it would now be paying Authority flow charges at the low-quantity end of the sliding scale of fees. Instead of New Brunswick's cost of $95,000 to treat Milltown's sewage in 1982, Milltown would have paid about $145,000. In the two decades, 1963–1982, it would have paid the Authority a total of over $1.4 million in annual charges.

But, Milltown argues, it could have joined with other municipalities to use a "Lawrence Brook interceptor" that could have been built to serve them. The evidence plainly shows that the demand was insufficient for that to have occurred; that the Authority would not have built the hypothetical interceptor and that the construction costs would have been unwarranted.

It appears, in sum, that Milltown gave up very little over the years and gained much. Its gains continue and accelerate to this day. Performing its part of the bargain is not much of a burden any more. Its lost opportunities are simply a fantasy.

### The Impact of Federal Law

Both the Authority and the city have depended in the past and will depend in the future on federal funding of construction. EPA regulations require the Authority and the city to distribute the expense of operations by means of ordinances enacting a schedule of fair sewer user charges. 40 CFR 35.929.1, 35.935.-13(c). EPA takes the apparently valid position that Milltown's failure to have and enforce such an ordinance violates the regulations. See New Brunswick v. Milltown, 686 F.2d 120 (3 Cir.1982). As a result, millions of federal dollars are being withheld from grants to the Authority for construction that was

completed some time ago. Current and future Authority grant applications are encumbered by the Milltown problem. New Brunswick's own search for federal construction grants is similarly impeded and endangered.

The existence of the 1914 contract and Milltown's resulting disinclination to adopt a sewer user charge ordinance therefore burdens New Brunswick both as an Authority participant and in its own right. Over the years federal grants for 75% of sewerage construction costs have been available to authorities and municipalities. Additional state aid has been granted on the basis of the satisfaction of federal requirements. Disentitlement to free access to these grants is a heavy price for New Brunswick to pay. And, it is a price that was far beyond the contemplation of the contracting parties in 1914.

The Authority seeks an order requiring Milltown to adopt a sewer user charge ordinance. That would be premature. As a result of my judgment, Milltown will either leave New Brunswick's system or remain under an agreement imposing charges for sewerage service. In either case, Milltown's new costs are now unmeasurable. When final arrangements are made, whatever they may be, Milltown can then act to distribute its local costs. I will order only that any revenue measure to be adopted by Milltown to distribute costs of sewerage service be in accordance with applicable EPA regulations.

### Conclusion

What seemed in 1914 to be an equitable arrangement has now become grossly unfair. New Brunswick's costs have radically increased in ways the parties never contemplated. Milltown's current burden is miniscule. Its burden in the past has been more than offset by the tremendous savings it has made. Both the Authority and the city are significantly impeded in their search for federal and state aid for sewerage improvement projects.

I need not say whether any one of these dramatic changes tips the scale. But their combined weight requires relief. One group of taxpayers has no right to impose on another a burden heavier in radical and significant ways than was ever imagined when the burden was first accepted 69 years ago or when it was last reviewed by the courts 34 years ago.

The question of remedy need not be answered now. Milltown needs time to weigh its courses of action and discuss them with New Brunswick. If the parties cannot find a satisfactory answer, this court will impose one. It is unlikely that the court's answer will be to end Milltown's access to New Brunswick's sewers. More likely, it will be to set a fair price for the city's continued services. I will leave it to the parties to advise if they fail to reach their own solution. It may be that application will be made to set a fair interim price if negotiations are lengthy.