**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1587-21

JERSEY CITY MUNICIPAL
UTILITIES AUTHORITY, a public
corporation organized under the
laws of the STATE OF NEW
JERSEY, and the CITY OF JERSEY
CITY, a municipal corporation of
the STATE OF NEW JERSEY,

      Plaintiffs-Appellants/
      Cross-Respondents,

v.

TOWN OF DOVER, TOWN OF
BOONTON, BOROUGH OF
ROCKAWAY, TOWNSHIP OF
ROCKAWAY, TOWNSHIP OF
DENVILLE, TOWNSHIP OF
RANDOLPH, BOROUGH OF
VICTORY GARDENS, TOWNSHIP
OF BOONTON, BOROUGH OF
WHARTON, all municipal
corporations of the STATE OF NEW
JERSEY, THE WHARTON
SEWERAGE AUTHORITY, THE
RANDOLPH TOWNSHIP
MUNICIPAL UTILITIES
AUTHORITY, and ROCKAWAY
VALLEY REGIONAL

SEWERAGE AUTHORITY, all
public corporations organized under
the laws of the STATE OF
NEW JERSEY,

     Defendants-Respondents/
     Cross-Appellants.

---

Argued March 5, 2024 – Decided May 20, 2025

Before Judges Rose, Smith, and Perez Friscia.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1313-10.

Jonathan P. Vuotto argued the cause for appellants/cross-respondents (McAndrew Vuotto, LLC, attorneys; Jonathan P. Vuotto and Anthony J. Fredella, on the briefs).

Andrew Michael Brewer argued the cause for respondent/cross-appellant Rockaway Valley Regional Sewerage Authority (Maraziti Falcon, LLP, attorneys; Robert Mellinger and Andrew Michael Brewer, on the briefs).

Dawn M. Sullivan argued the cause for respondents/cross-appellants Township of Boonton, Township of Denville and Town of Boonton (Dorsey & Semrau, LLC, attorneys, join in the brief of respondent/cross-appellant Rockaway Valley Regional Sewerage Authority).

David C. Pennella argued the cause for respondent/cross-appellant Town of Dover.

A-1587-21

Richard Harris Beilin argued the cause for respondent/cross-appellant Borough of Rockaway (The Wacks Law Group, attorneys; Richard Harris Beilin, on the brief).

Edward J. Buzak argued the cause for respondents/cross-appellants Township of Randolph, Randolph Township Municipal Utilities Authority and Township of Rockaway (Surenian, Edwards, Buzak & Nolan, LLC, attorneys; Edward J. Buzak, on the brief).

William George Johnson argued the cause for respondents/cross-appellants Borough of Wharton and Wharton Sewerage Authority (Johnson & Johnson, attorneys; William George Johnson, on the brief).

The opinion of the court was delivered by

SMITH, J.A.D.

This appeal arises from a decades-old settlement agreement among various municipal entities. The current parties are plaintiffs, City of Jersey City (Jersey City) and the Jersey City Municipal Utilities Authority (JCMUA) and defendants, the Rockaway Valley Regional Sewerage Authority (RVRSA), its municipal members and some of their municipal sewerage authorities (municipal defendants).

In 1968, Jersey City and the JCMUA sued several municipalities and related entities, including: the Towns of Dover and Boonton, and the Townships of Denville, Rockaway and Randolph, the Boroughs of Rockaway, Victory

Gardens, and Wharton, and the Wharton Sewerage Authority (the 1968 defendants). Plaintiffs sought contributions from the 1968 defendants for certain repairs and upgrades to the municipal sewerage treatment plant. The repairs were mandated by the New Jersey Department of Health (DOH). In 1971, the parties entered into a settlement agreement which led to the creation of the RVRSA. The 1971 settlement agreement was amended in 1984 to define plaintiffs' payment obligations to cover the cost of the RVRSA's operation, maintenance, repair and upkeep, as well as other costs.

In 2010, plaintiffs sued the current defendants, asserting various theories designed to terminate the agreements and end their payments to the RVRSA. Defendants counterclaimed for breach of contract, seeking damages. The trial court rejected plaintiffs' claims, finding that Jersey City had not satisfied the agreement's termination conditions. The trial court also rejected defendants' breach of contract claims, finding they failed to prove damages. Plaintiffs appealed and defendants cross-appealed.

We affirm for the following reasons.

I.

A.

History of the Parties' Original Agreements

In 1899, Jersey City contracted with the Jersey City Water Supply Company, JCMUA's historic predecessor, to secure and provide for its residents source water rights for 70 million gallons per day (MGD) from the Rockaway River. That contract also provided for the construction of a reservoir on land owned by Jersey City located in the Township of Parsippany, and for a twenty-three-mile aqueduct to deliver the water from the reservoir to the City.

Soon after it began using the reservoir in 1904, Jersey City grew concerned about sewage pollution flowing into the Rockaway River from various upstream Morris County municipalities. To protect its drinking water supply, Jersey City designed a sewage treatment plant and companion interceptor sewer line (the interceptor) that would gather and treat sewage from the Morris County municipalities and then discharge the treated effluent into the Rockaway River downstream from the reservoir.

In 1916, Jersey City and Dover entered into an agreement in which Jersey City agreed, "at its own expense, to build, construct and maintain for a period of forty years, and as much longer as the waters herein mentioned are used for potable purposes by it or its successors or assigns," an interceptor sewer line and treatment plant. In turn, Dover agreed to construct a local sewage collection system that would connect to the interceptor.

5

Between 1924 and 1966, Jersey City entered into separate agreements with each of the remaining municipal defendants. Like the agreement with Dover, in each agreement, Jersey City agreed to construct, operate and maintain an interceptor line to its treatment plant from each municipality, which in turn agreed to construct its own sewage collection system.

As an illustration of the relevant contract terms, the 1924 agreement between Jersey City and Rockaway Borough required Jersey City to "construct[] such system of drains and sewers at its own expense and . . . maintain and operate the same for a period of forty years and as much longer as the waters derived from the Rockaway River water-shed are used by it, its successors or assigns for potable purposes," and Rockaway Borough would "lay, construct, maintain and operate in the streets of said Borough, proper and sufficient lateral sewers and drains connecting with [Jersey City's] system." If Jersey City discontinued use of the Rockaway River as a water supply source, it would "convey jointly" all the rights of its property to Rockaway and the other municipalities "with like agreements . . . provided this conveyance shall in no wise [sic] relieve [Jersey City] of the obligation to maintain said trunk sewer and disposal plant for the full term of forty years." Upon such discontinuation, Jersey City's "liability . . . to further maintain said trunk sewer and disposal works" terminated "after

6

the expiration of said forty[-] years[] period of the further use of the waters of the Rockaway River as a source of potable water supply and the conveyance of [its interceptor and treatment plant]."

Jersey City's original treatment plant and interceptor was built at a cost of $2.5 million dollars. It commenced operation in 1928 with an original capacity of 2 MGD. In 1953, due to population increases in Morris County, Jersey City expanded its treatment plant from 2 MGD to 5.4 MGD, with a maximum flow of 7.5 MGD.

## B.

### The 1971 Settlement Agreement

In April 1967, the DOH found that Jersey City's expanded treatment plant did not comply with new water quality and wastewater treatment regulations. In July 1968, the DOH directed Jersey City to immediately repair the plant. The 1968 defendants declined to share in the repair costs.

As a result, Jersey City sued the 1968 defendants. It sought, among other things, to compel defendants to share the costs of bringing the treatment plant into compliance; pay for the reasonable value of the City's sewage treatment services; and to rescind, terminate, modify, or reform each of their individual agreements.

On July 31, 1971, the parties settled. The settlement agreement stated that after Jersey City "completed and placed in satisfactory operation all improvements and equipment necessary by the orders, . . . a Regional Sewerage Authority shall be formed pursuant to the provisions of N.J.S.A. 40:14A-1[ to -37] as amended," to take over "the supervision, operation, maintenance, complete control and complete responsibility" of the City's repaired facilities, including its treatment plant and interceptor.[1] The new regional sewerage authority had three years from the "date of take-over" to "construct an interceptor sewer for the collection of sewage and . . . construct and/or acquire and/or enlarge a new sewage treatment facility . . . ."

Paragraph 4(c) of the 1971 settlement agreement established the parties' payment obligations for "all operation, maintenance and repair expenses" of the City's "existing" treatment plant and interceptor. Payment terms were triggered by tiers of average daily sewage flow. It stated:

> [1] The City shall pay for all operation, maintenance and repair expenses of the existing treatment plant and trunkline up to an average daily flow of 4.5 [MGD] . . . .
>
> [2] The average cost of all operation, maintenance and repair expenses for the average daily flow from 4.5 [MGD] up to and including 6 million

---

[1] Sewerage Authorities Law, N.J.S.A. 40:14A-1 to -37.

gallons per day shall be borne by the respective municipalities served by the treatment plant on a pro rata basis . . . with each bearing the same ratio to the total expense that the number of each municipalities connections bear to the total number of all connections to the sewage collection system.

[3] The cost of all operation, maintenance and repair expenses for the average daily flow above 6 [MGD] up to and including 7 [MGD] (referred to hereinafter as overage expense) shall be borne equally by the City and the Regional Authority . . . [and] [e]ach municipality shall pay . . . to make up the Regional share of said overage expense.

[4] The cost for all operating, maintenance and repair expenses for flows above 7 [MGD] shall be borne by the Authority[,] except that the City shall not contribute beyond the cost of 5 [MGD] on a total basis.

Paragraph 6 of the 1971 settlement agreement addressed Jersey City's obligation to pay for construction of the regional authority's new treatment plant and interceptor as well as their "operating, maintenance, repair and upkeep expenses." It stated:

The City shall pay over to the [r]egional [a]uthority . . . the following amounts.

(a) A capital or principal amount equivalent to an amount that bears the same ratio to the total and complete local cost of the project that 4.5 million gallons per day bears to the total daily treatment capacity of the new treatment plant and the interceptor and appurtenant facilities which comprise the "project":

i.e.: City Share =

Total Cost Treatment Plant x $\frac{4.5 \text{ [MGD]}}{\text{Total Daily Capacity Treatment Plant}}$

+ Total Cost Interceptor Sewers x $\frac{4.5 \text{ [MGD]}}{\text{Total Daily Capacity of Interceptor Sewers}}$
And Appurtenant Facilities

(b) An amount which represents its share of the annual operating, maintenance, repair and upkeep expenses of the project bearing the same ratio to the total annual operating, repair, and maintenance costs that 4.5 [MGD] per day bears to the average daily plant flow:

i.e.: City Share =

Total Annual Operating, x $\frac{4.5 \text{ [MGD]}}{\text{Average daily plant flow}}$
Repair and Maintenance

Under paragraph 7 of the 1971 settlement agreement, Jersey City was not responsible for any expansion or enlargement costs at the new treatment facility.

It stated:

In the event the new treatment facility and interceptor and appurtenances ("project") are expanded or enlarged, the City shall not be responsible for any enlargement or expansion costs. Upon complete repayment of all interest and principal for the original project cost, the City shall not be responsible for any further principal and interest expenses, but shall be responsible for their share of operating, repair and maintenance costs as long as "project" is maintained in operation.

10

In summary, Jersey City shared responsibility with the regional authority and respective municipalities under the 1971 settlement agreement for "operation, maintenance and repair expenses" of the existing treatment plant and interceptor by way of a payment arrangement structured by tiers of average daily sewage flow. In addition, the 1971 agreement provided a formula for Jersey City's obligation to pay for construction of the regional authority's new treatment plant and interceptor and the new plant's "operating, maintenance, repair and upkeep expenses."

Finally, the agreement also provided Jersey City's payments for the upkeep of the current facility and for the new facility would be allocated among the respective municipal members consistent with a schedule. That schedule showed each member's share in accordance with the share of its average daily capacity to an average daily flow of 4.5 MGD. As of the date of execution of the 1971 settlement agreement, the schedule contained the following municipal allocation:

1971 ALLOCATION SCHEDULE

| | |
|---|---|
| Town of Boonton | 0.503 MGD |
| Township of Boonton | 0.043 MGD |
| Town of Dover | 1.425 MGD |

A-1587-21

| | |
|---|---|
| Township of Denville | 0.717 MGD |
| Township of Randolph | 0.216 MGD |
| Borough of Rockaway | 0.534 MGD |
| Township of Rockaway | 0.569 MGD |
| Borough of Victory Gardens | 0.096 MGD |
| Borough of Wharton | <u>0.397 MGD</u><br>4.500 MGD |

C.

Rockaway Valley Regional Sewerage Authority

On November 29, 1971, RVRSA was created as a public corporation under the Sewerage Authorities Law, becoming the "Regional Sewerage Authority" envisioned in the 1971 settlement agreement. Jersey City and other municipal defendants became RVRSA members, comprising its Board along with the municipality of Mine Hill and the Picatinny Arsenal. The Board directs RVRSA management, which handles operational matters including major equipment acquisitions. RVRSA's executive director and engineers exercise discretion in operating the facilities to comply with applicable laws, regulations, and permit requirements. RVRSA provides wastewater treatment to its municipal members except Jersey City, which receives only limited treatment service. Members pay an annual service charge to fund plant operations.

A-1587-21

In 1976, RVRSA entered into a federal grant agreement with the United States Environmental Protection Agency (USEPA) for construction of a new interceptor sewer line. By 1982, RVRSA had completed neither the new interceptor nor the new plant. Despite these delays, Jersey City's payments to RVRSA increased from approximately $350,000 in 1973 to over $1.2 million per year by 1982.

D.

The 1982 Litigation

During the 1970s, while delays prevented the RVRSA's construction of the new plant and interceptor, Jersey City's tax revenues declined due to substantial valuation loss in its tax ratable properties. In June 1982, Jersey City filed a verified complaint and order to show cause against the RVRSA and the municipal defendants seeking, among other things, to modify or eliminate its payment formulas and obligations under the 1971 settlement agreement, and to equitably apportion the members' financial contributions to RVRSA's operation, maintenance and capital costs. By mid-1982, RVRSA had already constructed the new 21 MGD interceptor, and was engaged in a phased construction of its

13

new 12 MGD treatment plant. Phase one involved construction of the treatment facility, and phase two involved construction of sludge disposal facilities.[2]

In September 1983, Jersey City filed an amended complaint, challenging the new plant's design and construction. The complaint alleged the plant was designed to service capacity in excess of 12 MGD, and that certain construction materials to be used were likely to result in higher and more frequent maintenance and repair costs.

In the following months, the parties adopted individual resolutions with an eye towards settlement. We cite four of the resolutions here: RVRSA; Jersey City; Denville Township; and Randolph Township.

RVRSA's December 1983 resolution declared that it "agreed [with the Jersey City plaintiffs] upon proposed terms of settlement to be recommended to the [other] parties . . . in order to terminate the litigation." The resolution stated that it considered the following settlement terms "fair, reasonable and equitable":

> I. The terms of the existing [1971] . . . [s]ettlement shall
> be clarified to provide as follows:

---

[2] The record refers to the construction plan for the new treatment plant as involving "Segments I and II." For ease of reference in this opinion, we refer to the "Segments" as "Phase I" and "Phase II," or "phases."

a. The average daily capacity of the new treatment facility currently under construction shall be 12 [MGD].

b. Jersey City shall not be required to contribute to the capital cost of any future expansion of the treatment plant capacity beyond 12 [MGD].

c. The term "treatment facilities" . . . shall include sludge treatment, processing, and disposal facilities. ([Phase II]). Jersey City acknowledges its obligation to contribute to the cost of constructing such facilities in accordance with the capital contribution formula set forth in the . . . [1971 settlement agreement].

II. Jersey City's capital obligation for the new treatment facility . . . shall be reduced by the sum of $500,000. Such reduction shall be implemented in the form of annual credits against Jersey City's payments for such capital share, during each year of the term of permanent financing of such project.

The annual credit shall be the amount necessary in each year to amortize $500,000 for the term and at the rate of the permanent financing eventually obtained by [RVRSA] for the treatment plant project.

The amount thereby credited to Jersey City from year to year shall be added to the capital payment due from the remaining members . . . .

The $500,000 credit payable to Jersey City shall not be affected if [RVRSA] shall receive a grant from the State of New Jersey toward the construction of [Phase I] of the treatment facilities.

15

III. The [1971 settlement agreement] . . . shall be amended to provide that the City waives any and all rights to challenge any provisions thereof at any time in the future.

In its January 1984 City Council resolution, Jersey City acknowledged that the 1971 settlement agreement obligated it "to pay [37.5]% of all capital costs needed for the construction of the RVRSA's new [wastewater][3] treatment facility" and "to pay a sizeable portion of all operation, maintenance and repair expenses (M&O) incurred by the RVRSA with respect to the existing treatment facility." However, "upon completion of the construction of the new wastewater treatment facility," Jersey City's responsibility for M&O was to be based on the formula below:

(Total Annual Operating,  x        4.5 MGD  )
(Repair & Maintenance         Average Daily)
(                             Plant Flow     )

Additional key terms in Jersey City's resolution stated:

1. Jersey City's capital obligation for the new wastewater treatment facility, pursuant to the [s]tipulation of [s]ettlement, will be reduced by the sum of $500,000.00 over the term of the financing of the project (construction of the new wastewater treatment facility). This figure was arrived at by factoring out costs associated with . . . other engineering aspects of the plant.

---

[3]  For the ease of the reader, we substitute the single word "wastewater" everywhere in the quoted documents where the words "waste water" appear.

16

Such reduction shall be implemented in the form of annual credits against Jersey City's payments for such capital share, during each year of the term of permanent financing of the project.

The annual credit shall be the amount necessary in each year to amortize $500,000.00 for the term and at the rate of the permanent financing eventually obtained by the RVRSA for the project.

The $500,000.00 credit shall not be affected if the RVRSA shall receive any additional grants.

The amount credited to Jersey City shall be added to the capital payments due from the remaining members of the RVRSA.

2. The terms of the existing [s]tipulation of [s]ettlement shall be clarified to provide as follows:

    A. The average daily plant flow and total daily capacity of the new treatment facility currently under construction shall be 12 MGD for the purposes of calculating Jersey City's share of costs.

    B. Jersey City shall not be required to contribute to the capital cost of any future expansion of the treatment plant capacity beyond 12 MGD.

    C. The term "Treatment Facilities" is used in the [s]tipulation of [s]ettlement shall include sludge treatment processing and disposal facilities (Segment II). Jersey City acknowledges its obligation to contribute to the cost of constructing such facilities in accordance with the capital

17

contribution formula set forth in the initial
[s]tipulation.

3. The pending litigation instituted by Jersey City . . .
shall be dismissed by Jersey City with prejudice to its
right to relitigate any issue concerning the [s]tipulation
of [s]ettlement or Jersey City's obligation thereunder,
and without costs to any party[.]

Other municipalities referenced Jersey City's proposed settlement terms. Denville Township and the Randolph Township Municipal Utilities Authority adopted resolutions authorizing settlement of the litigation, noting that "Jersey City has proposed a settlement" that:

would continue to obligate the City of Jersey City to
pay the same share of the operation and maintenance
costs of the existing plant and the new treatment plant
as well as the same capital costs thereof, except to the
extent that [it] would receive a credit against [its]
obligation to the extent of a total of $500,000.00
payable over the life of the permanent bonds for the
treatment facility together with interest thereon at the
rate at which the permanent bonds for the treatment
facility are sold; and

. . . said credit is estimated to be approximately
$70,000.00 per year inclusive of interest over the life of
the bonds[.]

Randolph Township Municipal Utilities Authority's resolution also stated that the yearly credit "would reduce Jersey City's proportionate share of the operation and maintenance and capital costs of existing and new facilities by

18

approximately 3.5 percent."  Denville's resolution noted that the settlement would increase its own "projected charges . . . from the RVRSA inclusive [of the] operation and maintenance of the treatment plant, interceptor line, and the capital costs for the interceptor line and treatment plant by approximately two percent (2%)."

E.

The 1984 Amendment

On August 17, 1984, after the municipal defendants adopted their individual resolutions, the trial court approved the parties' amendment to the 1971 settlement agreement.  Paragraph 6 of the 1971 agreement was amended to read:

> 6. Jersey City shall pay over to the Regional Authority . . . the following amounts.
>
> (a) A capital or principal amount equivalent to an amount that bears the same ratio to the total and complete local cost of the project that 4.5 million gallons per day bears to the total daily treatment capacity of the New Treatment Facilities, [Phases I and II], less Five Hundred Thousand ($500,000) Dollars.
>
> i.e.:  Jersey City Share =
>
> Total Local Cost     x    4.5 mgd    -   $500,000
> Treatment Plant           12 mgd
> (including [Phase II])

A-1587-21

(b) A capital or principal amount equivalent to an amount that bears the same ratio to the total and complete local cost of the New Interceptor that 4.5 million gallons per day bears to the total daily capacity of the New Interceptor,

i.e.:  Jersey City Share =

$$\text{Total Local Cost} \times \frac{\text{4.5 mgd}}{\text{21 mgd}}$$
$$\text{New Interceptor}$$

(c) An amount which represents Jersey City's share of the operating, maintenance, repair and upkeep expenses of the New Treatment Facilities and New Interceptor, bearing the same ratio to the total annual operating, maintenance, repair that 4.5 million gallons per day bears to the average daily plant flow,

i.e.:  City Share =

$$\text{Total Annual Operating,} \times \frac{\text{4.5 mgd}}{\text{Average Daily}}$$
$$\text{Repair, Maintenance} \qquad \text{Plant Flow}$$
$$\text{and Upkeep Expenses}$$

(d) The parties hereby stipulate 12 mgd as the capacity of the New Treatment Facilities ([Phases I and II]) and further stipulate 21 mgd as the capacity of the New Interceptor.

The 1984 amendment modified the payment formulas used to calculate Jersey City's assessed portion of the principal and interest costs of the capital RVRSA raised to pay for the new facilities.  This meant Jersey City's assessment for the capital costs of the new treatment plant would be fixed at a ratio of 4.5 MGD to the total 12 MGD of total daily capacity, or 37.5% of total costs less a

20

$500,000 credit, and its assessment for the new interceptor would be fixed at a ratio of 4.5 MGD to the 21 MGD of total daily capacity, or 21.4% of the total costs.

The 1984 amendment further stated that, while Jersey City was "obligat[ed] to pay for its share of the construction costs of [Phase II] of the New Treatment Facilities (sludge handling and disposal)" in accordance with paragraph 6(a), it "shall not be obligated to contribute to any future expansion of the New Treatment Facilities beyond the 12 [MGD] capacity[.]" Jersey City's "obligation . . . to pay for the construction of the New Treatment Facilities . . . shall remain unchanged and shall not in any way be affected by the . . . receipt of any future Federal and/or State funding by the [Regional] Authority."

The 1984 amendment stated that "[a]ll of the terms and provisions of the [1971 settlement agreement] not superseded, modified or changed by, or inconsistent with the terms and provisions of this Amendment [(the 1984 amendment)], shall remain in full force and effect and binding upon all parties hereto."

The 1984 amendment contained certain language binding Jersey City.

First, Jersey City agreed to "waive[] any and all rights to challenge any provision of the [1971 settlement agreement] or this Amendment upon any basis or theory whatsoever at any time in the future." (Emphasis added).

Next, Jersey City agreed to:

> release and forever discharge each other from any and all controversies, suits, actions, causes of action, damages, claims or demands, in law or in equity which either party ever had, now has or hereinafter can, shall, or may have, for, upon or by reason of any matter, cause or thing whatsoever, from the beginning of the world to the date of the entry hereof.

Finally, the claims in Jersey City's 1982 complaint were dismissed "with prejudice to the rights of Jersey City to relitigate any issue concerning the [1971 settlement agreement], the [1984] Amendment thereto, or Jersey City's obligations thereunder."

## F.

### Current Litigation

On January 7, 2010, plaintiffs sued defendants seeking certain relief, including: declaratory judgment terminating their contribution to RVRSA's capital costs upon repayment of prior debt; declaratory judgment voiding the 1984 amendment; and damages for the incorrect assessment of capital costs.

22

In their complaint, plaintiffs alleged that Jersey City's payment obligations under the 1984 amendment were "manifestly inequitable" compared with defendants' payment obligations and should be voided. Defendants answered and counterclaimed, alleging plaintiffs breached the 1984 amendment by withholding mandatory payments.

After the parties cross-moved for summary judgment, the court granted defendants partial summary judgment. The court dismissed count two of plaintiffs' complaint without prejudice "to the extent that it include[d] rights or claims that were or could have been raised at the time of the 1984 [s]ettlement [a]greement." The court denied reconsideration.

Plaintiffs filed an amended complaint, seeking a declaration that their obligation to pay RVRSA's capital and operations costs had expired. Defendants answered and counterclaimed. The parties again cross-moved for summary judgment, which the court granted in part and denied in part.

The court found plaintiffs no longer were contractually required to contribute to the "principal and interest costs related to building" RVRSA's treatment facility and interceptor, but they remained obligated to contribute to the "principal and interest costs . . . for operating, maintenance, repair and upkeep" of the RVRSA's treatment facilities and interceptor. Significantly, the

23

trial court further found plaintiffs' duty to pay principal and interest costs for operation, maintenance, and repair of the RVRSA treatment plant and interceptor "ongoing." The court also found that the 1971 settlement agreement and 1984 amendment did not require RVRSA to pay plaintiffs interest on the $500,000 credit. The court next dismissed with prejudice defendants' counterclaim for rescission of the stipulations and assertion of a theory of promissory estoppel. The court then denied the motions in all other respects.

On June 26, 2017, the court partially granted plaintiffs' motion for reconsideration, dismissing with prejudice defendants' counterclaim for breach of the implied covenant of good faith and fair dealing. It also granted plaintiffs' motion establishing how evidence would be presented at trial on the question of whether the "project" was still "maintained in operation," in order to determine whether plaintiffs remained contractually obligated to contribute to RVRSA's operation, maintenance, repair and upkeep costs. The court, however, denied plaintiffs' motion in limine to classify certain "operation, maintenance, repair and upkeep projects" as "capital" projects after repayment of the original "project" debt.

The court conducted a bench trial on liability between October 23, 2017, and June 6, 2018. Multiple witnesses testified at trial including: John Kennedy,

24

plaintiffs' counsel between 1982 and 1984; Gerald McCann, Jersey City's mayor in 1982; Daniel Becht, JCMUA executive director from 2005 to 2017; Frank Ho, RVRSA's executive director, Sandy Thai, RVRSA's chief financial officer; Joseph Lowell, Denville's RVRSA representative; John Folk, JCMUA's chief financial officer; and Gary Higgins, plaintiffs' municipal accounting and auditing expert.

During trial, the court granted plaintiffs' motion to reinstate their earlier dismissed claim that they were overbilled by RVRSA's application of the $500,000 credit. The court then vacated the portions of its April 4 and June 26, 2017 orders declaring that defendants were not obligated to pay interest on plaintiffs' $500,000 credit claim and reinstated count three of the amended complaint seeking damages.

After trial, the court entered partial judgment in favor of defendants on October 31, 2018, finding that paragraph 7 of the 1971 settlement agreement bound plaintiffs to contribute their proportional share towards RVRSA's repair, operation, maintenance, and upkeep. The court also found that the RVRSA "project" as defined in the 1971 settlement agreement was still "maintained in operation." In making this determination, the trial court interpreted certain terms which appeared in the settlement agreement to reflect what it found were

the parties' intent at the time of execution, specifically the terms "repair," "operation, maintenance and upkeep" and "enlargement, expansion, improvement or upgrade." As a result, the court determined that plaintiffs breached their agreement with RVRSA by withholding funds for continued operation, repair, and maintenance expenses, subject to any proven offsets. Plaintiffs then moved to conform or amend the pleadings to the trial evidence, and the court denied the application. The court next denied plaintiffs' motion to vacate the partial judgment and proceeded to conduct a bench trial on damages.

G.

Damages Trial

The court tried the damages case over six days in 2021. The court heard testimony from the RVRSA's executive director, Joann Mondisi, and other witnesses. Mondisi testified regarding the formulas the RVRSA used to calculate Jersey City's assessments, and unilateral changes the RVRSA board made to those formulas in the mid-2000s. The parties also presented dueling experts who testified about how to define terms such as facility repair, operation, maintenance and upkeep, together with expansion, improvement and upgrade. The experts opined on where the various major projects taking place at RVRSA's facilities--sludge thickening facilities, biosolids upgrades, and sewer interceptor

26

rehabilitation--fell within those definitions. The experts then opined on whether the projects taking place would have any impact on the 12 mgd capacity of the treatment plant.

On November 3, 2021, the court issued an order dismissing RVRSA's counterclaim for damages. The court also denied plaintiffs' motions to declare that "RVRSA incurred 'no damages.'" The court dismissed RVRSA's counterclaim because it found the RVRSA failed to prove damages. The court next denied RVRSA's motion for reconsideration. All parties appealed.[4]

On appeal, plaintiffs raise multiple issues. They contend the court committed error when it: interpreted the 1971 settlement agreement and its 1984 amendment to require plaintiffs to pay a share of the RSRVA's principal and interest expenses for ongoing maintenance and repairs at the RSRVA's sewage treatment facility; declined to terminate the 1971 settlement agreement under Borough of West Caldwell;[5] improperly modified terms of the 1971 settlement agreement; improperly interpreted the 1971 settlement agreement when it found that the RSRVA "project" was still "maintained in operation"; determined that

---

[4] On August 26, 2022, we dismissed the cross-appeal by Borough of Victory Gardens and suppressed its brief.

[5] Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9 (1958).

the waiver and release terms of the 1984 amendment barred certain plaintiff's claims; dismissed plaintiff's damages claims; found the RSRVA had no fiduciary obligation to its municipal members; found that the RSRVA did not materially breach the 1971 settlement agreement; and transferred venue. In its cross-appeal, RSRVA contends that the trial court committed error when is dismissed RSRVA's counterclaim.

## II.

## A.

In reviewing a court's decision on a motion for summary judgment, we apply the same standard governing the trial courts. Boyle v. Huff, 257 N.J. 468, 477 (2024) (citing Samolyk v. Berthe, 251 N.J. 73, 78 (2022)). Under these standards, courts should grant a motion for summary judgment if they find that "there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). "When no issue of fact exists, and only a question of law remains, [appellate courts] afford[] no special deference to the legal determinations of the trial court." Boyle, 257 N.J. at 477 (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)).

At the appellate level, "[i]nterpretation and construction of a contract is a matter of law for the court subject to de novo review." Fastenberg v. Prudential Ins. Co., 309 N.J. Super. 415, 420 (App. Div. 1998). We decide such purely legal questions without deferring to a lower court's "interpretation of the law and the legal consequences that flow from established facts." Manalapan Realty, LP v. Twp. Comm., 140 N.J. 366, 378 (1995); see also Zaman v. Felton, 219 N.J. 199, 216 (2014).

Factual findings by the court in a bench trial are considered binding on appeal when supported by adequate, substantial and credible evidence in the record. Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974). "Appellate review does not consist of weighing evidence anew and making independent factual findings; rather, our function is to determine whether there is adequate evidence to support the judgment rendered at trial." Cannuscio v. Claridge Hotel & Casino, 319 N.J. Super. 342, 347 (App. Div. 1999). However, the trial court's legal conclusions are reviewed de novo. Manalapan Realty, 140 N.J. at 378.

III.

A.

Plaintiffs argue the court erred on summary judgment by failing to terminate the 1971 settlement agreement. Plaintiffs assert they have been paying approximately forty-five percent of RVRSA's capital expenses and operating and maintenance costs for over fifty years, and they no longer need the municipal defendants to protect Jersey City's water supply by connecting to RVRSA's treatment plant. They posit this is because federal and state law now require all wastewater and sewage to be treated.

Plaintiffs make two principal arguments. First, plaintiffs contend the court erred by not terminating the amended 1971 settlement agreement as a perpetual contract. Second, plaintiffs claim the settlement terms have been in force for more than a reasonable time, resulting in plaintiffs unfairly subsidizing nearly half of defendants' wastewater treatment costs, while receiving no consideration in return. We are unconvinced. After a thorough review of this voluminous and challenging record, we cannot conclude the trial court committed error.

"Settlement of litigation ranks high in our public policy." Savage v. Township of Neptune, 472 N.J. Super. 291, 305 (App. Div. 2022) (quoting

Nolan by Nolan v. Lee Ho, 120 N.J. 465, 472 (1990)), certif. granted, 255 N.J. 284 (2023). The strong public policy favoring settlements "rests on the recognition that 'parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone.'" Gere v. Louis, 209 N.J. 486, 500 (2012) (quoting Impink ex rel. Baldi v. Reynes, 396 N.J. Super. 553, 563 (App. Div. 2007)). In furtherance of this policy, we "'strain to give effect to the terms of a settlement wherever possible.'" Capparelli v. Lopatin, 459 N.J. Super. 584, 603 (App. Div. 2019) (quoting Brundage v. Est. of Carambio, 195 N.J. 575, 601 (2008)). See Schmoll v. J.S. Hovnanian & Sons, LLC, 394 N.J. Super. 415, 420 (App. Div. 2007) ("Settlements are encouraged and should bring finality to litigation.").

A settlement agreement is "'governed by [the general] principles of contract law.'" Savage, 472 N.J. Super. at 305 (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 482 (2016)). "An agreement to settle a lawsuit is a contract which, like all contracts, may be freely entered into and which a court, absent a demonstration of 'fraud or other compelling circumstances,' should honor and enforce as it does other contracts." Brundage, 195 N.J. at 600-01 (quoting Pascarella v. Bruck, 190 N.J. Super. 118, 124-25 (App. Div. 1983)) (internal quotation marks omitted). It follows that "when the

31

intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement." Quinn v. Quinn, 225 N.J. 34, 45 (2016). "[T]he court cannot make a new and better contract for [the parties] than they made for themselves." N.J. Transit Corp. v. Certain Underwriters at Lloyd's London, 461 N.J. Super. 440, 463 (App. Div. 2019) (citing Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J. 403, 415 (2016)). "It is not the function of the court to rewrite or revise an agreement when the intent of the parties is clear." Quinn, 225 N.J. at 45.

Our Supreme Court has considered the legal sufficiency of decades-old sewer infrastructure agreements between municipalities. See Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9 (1958).

In West Caldwell, the Court interpreted a written sewer service agreement between West Caldwell and Caldwell. The agreement was executed in 1912 and amended in 1955. Id. at 14. The agreement contained no language spelling out its duration, Id. at 27, but included language providing West Caldwell residents the right to connect to Caldwell's sewer system and treatment plant. Id. at 14. In 1956, West Caldwell decided to construct its own sewer system. Id. at 21. In turn, Caldwell sought relief declaring that West Caldwell was bound by the forty-four-year-old agreement as amended. Id. at 14, 21.

32

The Court determines what constituted a reasonable time for duration in the contract between the two Caldwells.  Id. at 28.  The Court held that, "[w]hat constitutes a 'reasonable time' is usually an implication of fact, and not of law, derivable from the language used by the parties considered in the context of the subject matter and the attendant circumstances, in aid of the apparent intention." Ibid.

The Court ultimately held that "a municipality cannot bind itself by a perpetual contract, or a contract of unreasonable duration, unless by legislative sanction . . . particularly where the subject matter of the contract involves the exercise of police power in the vital area of . . . sanitation."  Dorchester Manor v. Borough of New Milford, 287 N.J. Super. 163, 169 (Super. Ct. 1994) (citing West Caldwell, 26 N.J.at 31) (emphasis added).

Paragraph 7 of the 1971 settlement agreement establishes a finite endpoint for the parties' relationship.  It states that Jersey City's obligations stop when the treatment facility becomes inoperable.  Paragraph 7 further states that the City "shall be responsible for their share of operating, repair and maintenance costs as long as 'project' is maintained in operation," and "project" was defined as "construct[ion of] an interceptor sewer for the collection of sewage and . . . a new sewage treatment facility."  When we consider this language, we see no

33

evidence in the record to support the inference that RVRSA's treatment facilities are inoperable, the sole paragraph 7 condition which would permit plaintiffs to terminate. We conclude that the 1971 Agreement and its 1984 Amendment are not perpetual in nature.

N.J.S.A. 40:14A-23 states in part:

> Any sewerage authority . . . <u>for the carrying out and effectuation of its purposes</u> . . . may enter into a contract or contracts providing for <u>or relating to</u> the collection, treatment and disposal of sewage . . . . Such contract or contracts may . . . include provision for all or any part or a share of the amounts necessary . . . <u>to pay or provide for the expenses of operation and maintenance of the sewerage system</u>, including without limitation insurance, extension, betterments and replacements and the principal of and interest on any bonds, and . . . [a]<u>ny such contract may be made with or without consideration and for a specified or an unlimited time and on any terms and conditions</u> which may be approved by or on behalf of the governmental unit and which may be agreed to by the sewerage authority in conformity with its contracts with the holders of any bonds, and shall be valid whether or not an appropriation with respect thereto is made by the governmental unit prior to authorization or execution thereof. Any contract heretofore or hereafter entered into pursuant to authority of this section shall be valid and shall be binding upon the parties thereto whether or not the terms or text of said contract had been set forth in full or stated in any ordinance or resolution authorizing such contract provided the form of such contract had been filed as aforesaid and the place and fact of such filing was described in such ordinance.

[(Emphasis added).]

N.J.S.A. 40:14A-24 states:

> In order <u>to carry out and effectuate its purposes</u>, any sewerage authority, subject to its contracts with the holders of any bonds, is hereby empowered to provide, construct, <u>maintain and operate facilities</u> for the treatment and disposal of sewerage and industrial wastes originating within or without the district and to enter into a contract or contracts with any other sewerage authority or any municipality in an adjoining State which is authorized to enter into such a contract or any person on such terms and conditions as such contract or contracts may contain, providing for or relating to the treatment and disposal of any such sewerage and industrial wastes. <u>Any such contract may contain any of the terms and provisions set forth in section 23 of this act and permitted by said section to be contained in contracts made thereunder</u>. The sewerage authority and such other sewerage authority, municipality and person are hereby authorized and directed to do and perform any and all acts or things necessary, convenient or desirable to carry out and perform every such contract and to provide for the payment or discharge of any obligation thereunder in the same manner as other obligations of such sewerage authority, other sewerage authority, municipality or person.

[(Emphasis added).]

While the 1971 settlement agreement and its 1984 amendment do not directly provide for the collection, treatment and disposal of sewage, the record shows they were intended for RVRSA's "carrying out and effectuation of its

35

purposes," i.e., operation, repair and maintenance. It follows that they "relate to" RVRSA's collection, treatment and disposal of sewage. N.J.S.A. 40:14A-23. We also note that N.J.S.A. 40:14A-23 allows contracts to "include provision for all or any part or a share of the amounts necessary . . . to pay or provide for the expenses of operation and maintenance of the sewerage system . . . and . . . [a]ny such contract may be made . . . for a specified or an unlimited time."

If we were to find the agreement perpetual, and we do not, we would conclude the Legislature effectively sanctioned sewer-related contracts between municipal entities, like the 1971 settlement agreement, without consideration and for an unlimited term when it adopted N.J.S.A. 40:14A-23 and -24.

We are unpersuaded by plaintiffs' arguments and cannot conclude the trial court committed reversible error.

## B.

Plaintiffs contend the court erred by finding that they remain obligated to contribute to RVRSA's principal and interest costs for its operations, repair and maintenance costs. We do not agree.

In April 2017, the trial court partially granted plaintiffs' motion for summary judgment, making findings. The court found plaintiffs were:

> no longer obligated to continue to contribute towards the RVRSA Facilities' principal and interest costs

36

related to building the RVRSA Treatment Facility and RVRSA Interceptor but remain obligated to continue to contribute towards the principal and interest incurred by RVRSA for operating, maintenance, repair and upkeep of the RVRSA Treatment Facilities and RVRSA Interceptor.

Plaintiffs argue that the trial court misinterpreted paragraph 7 of the 1971 settlement agreement by finding they have a continuing obligation to pay for any "debt service," i.e., the principal and interest expenses associated with operations, repair and maintenance costs. Plaintiffs interpret paragraph 7 to end their responsibility for all principal and interest costs for <u>any</u> expenditure. They contend that operating, repair and maintenance costs are typically incurred and repaid within one year and without debt service.

Paragraph 7 emphasizes that Jersey City <u>shall not</u> be responsible for "any enlargement or expansion costs" for the new treatment facility, interceptor, and appurtenances, and for "any further principal and interest expenses" "[u]pon complete repayment of all interest and principal for the original project cost," but <u>shall</u> be responsible "for their share of operating, repair and maintenance costs as long as 'project' is maintained in operation."

The <u>West Caldwell</u> Court outlined an analytical framework for testing plaintiff's argument here. It stated:

[c]ontracts between municipalities stand on the same footing as contracts of natural persons and are governed by the same considerations in determining their validity and effect. And the existing statutes and rules of law are always among the[] [surrounding] circumstances to be considered in the exercise of the interpretive process.

[26 N.J. at 22 (third alteration in original) (citations omitted) (internal quotation marks omitted).]

With the guidance from the <u>West Caldwell</u> Court, we consider the surrounding circumstances of the 1971 settlement agreement.

Pursuant to paragraph 1 of the 1971 settlement agreement, RVRSA was created and governed under the Sewerage Authorities Law. N.J.S.A. 40:14A-10 provides: "For the purpose of raising funds to pay the cost of any part of its sewerage system, a sewerage authority shall have power to authorize or provide for the issuance of bonds pursuant to this act."

N.J.S.A. 40:14A-23 further authorizes a municipality to enter into an agreement with a sewerage authority to pay all or a share of the expenses related to operation and maintenance of the sewer system, including payment of principal and interest on bonds. The plain language of the statute permits the RVRSA to issue bonds to pay for its operation, repair and maintenance costs which, in turn, supports the trial court's interpretation of paragraph 7 to include

principal and interest payments as part of plaintiffs' continuing obligation under the 1971 settlement agreement.

The record does not support plaintiffs' assertion that operating, repair and maintenance costs are typically incurred and repaid within one year without incurring debt. Although the 2017 RVRSA operating and capital budgets in the record do not show any entries of debt financing for maintenance, repair, or operation costs, Lowell testified that RVRSA, at times, characterized some capital costs as operating, repair and maintenance costs. Folk, plaintiffs' witness, confirmed that the JCMUA used the terms "operation," "repair," and "maintenance" in JCMUA's own capital and authority budgets, and funded those costs over the years using debt with corresponding principal and interest payments.

When we consider the express language of paragraph 7 together with the 1984 amendments, we conclude that Jersey City has no obligation to pay principal or interest on any enlargement or expansion of the 12 mgd "project," but remains responsible for its share of other costs, such as for operating, maintenance, repair and upkeep. If those costs are financed, plaintiffs' responsibility will include principal and interest. For purposes of the agreement, we make no distinction between an RVRSA "capital project" or a "capital

expenditure."  Put another way, if the project cost in question constitutes "operating maintenance, repair, and upkeep" of the New Treatment Facilities or New Interceptor, then Jersey City must pay its share of the project under paragraph 6(c) of the 1984 amendment, unless the project expands RVRSA's wastewater treatment capacity beyond 12 mgd.  We note the record shows RVRSA has not exceeded the 12 mgd threshold.

We conclude the trial court did not commit error in finding plaintiffs were still obligated to contribute towards RVRSA's principal and interest expenses for operations, repair, and maintenance costs.

## C.

Plaintiffs contend the court erred by impermissibly changing the terms of the 1971 agreement and the 1984 amendment and imposing various new definitions.[6]  We are unconvinced.

---

[6] RVRSA asserts that the court's language should be upheld with the exception of the language requiring replacement to be with the "like kind" or the "lowest cost."  RVRSA, however, has failed to add that issue to its cross-appeal, so we do not address it.  A respondent, "in order to attack the actions below which were adverse to [them], must pursue a cross-appeal."  Burbridge v. Paschal, 239 N.J. Super. 139, 152 (App. Div. 1990) (quoting Franklin Disc. Co. v. Ford, 27 N.J. 473, 491 (1958)).  Rule 2:3-4(a) permits a respondent to file a cross-appeal as of right.

Plaintiffs posit that the court's definitions are inconsistent with the practical reality of RVRSA's projects and budgets, and the definitions are so broad that they can lead to RVRSA comingling operation costs from both its operating and capital budgets. Plaintiffs center on the trial court's addition of the terms "enlargement" and "expansion" to the agreement definitions. Plaintiffs claim that those terms contravene the language in paragraph 7, which states: "In the event the new treatment facility and interceptor and appurtenances ("project") are expanded or enlarged, the City shall not be responsible for any enlargement or expansion costs."

We consider the record and the relevant law.

The trial court made findings in its October 2018 statement of reasons supporting its order granting partial summary judgment to defendants after trial, interpreting certain disputed terms in the agreement to reflect what the court considered the parties' intent at the time of execution. The court focused on three concepts: "repair;" "operation, maintenance, and upkeep;" and "enlargement, expansion, improvement or upgrade." After considering the testimony presented at trial, including from the parties' experts, the trial court determined that plaintiffs' proportional share of costs, as set forth in paragraph 6(c) of the 1984 amendment, would be guided by the following definitions:

1. Repair – restoration of equipment, components and/or structures (appurtenances) to no more than the functional condition that existed prior to malfunction, defect, damage, or decay. However, restoration may be accomplished by replacement of like-kind if cost of replacement is less than the cost of repair, or if repair is impossible. If restoration cannot be accomplished with like-kind, it may be accomplished with the lowest cost upgrade, improvement, expansion, or enlargement.

2. Operation, maintenance, and upkeep – each term shall be considered interchangeable, and shall be defined as keeping the plant in good functional condition, including all services (i.e., labor), consumables (including utilities and nominally valued supplies and equipment), and/or replacement of equipment, components, and/or structures (appurtenances) that existed or were under actual construction at the time of the pay-off of the bonds in 2009. Such replacement shall be made with like-kind upon the end of a life cycle as defined by the manufacturer/builder, or by a qualified expert when no such life cycle is defined by the manufacturer and/or builder, and which replacement is only necessary to enable the plant to process wastewater at a monthly average of 12 mgd and/or in accordance with applicable law and/or governmental regulation. However, if replacement of like-kind is impossible or exceeds the cost of the lowest cost upgrade, improvement, enlargement, or expansion, the replacement may be accomplished with the lowest cost upgrade, improvement, enlargement, or expansion. Operation, maintenance, and upkeep under this definition shall also include any upgrade, improvement, enlargement, or expansion that is mandated by law and/or government regulation.

42

3. <u>Enlargement, expansion, improvement or upgrade</u> – each term shall be considered interchangeable and shall include any costs in excess of repair, maintenance, operation, and/or upkeep not otherwise mandated by law or government regulation.

The court found the 1971 settlement agreement terms clearly stated that plaintiffs were to continue contribution to the operation, maintenance, and repair of the plant after completion of the initial construction debt payment. However, since the 1971 agreement and its 1984 amendment did not define terms, the court relied upon "generally understood definitions . . . to guide the interpretation of the terms[.]" The court explained that "[t]he common understanding of preservation is defined as repair, operation, maintenance, and upkeep." Stated differently, JCMUA's proportional share of costs, as set forth in paragraph 6(c) of the settlement agreement, would be guided by those definitions regardless of accounting or engineering classifications.

"Whether two writings are to be construed as a single contract . . . depends on the intent of the parties." <u>Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn</u>, 410 N.J. Super. 510, 533 (App. Div. 2009) (quoting <u>Van Orman v. Am. Ins. Co.</u>, 680 F.2d 301, 306 (3d Cir. 1982)).

Here, the two documents must be read together, as the 1984 amendment stated that "[a]ll of the terms and provisions of the [1971] settlement agreement

43

not superseded, modified or changed by, or inconsistent with the terms and provisions of this Amendment, shall remain in full force and effect and binding upon all parties hereto." When we read the documents in the context of the full? trial record, we conclude that plaintiffs are not responsible for the expansion or enlargement of RVRSA's treatment facility itself beyond 12 mgd, but are responsible for their portion of all costs enabling it to process wastewater up to 12 mgd.

We conclude that the trial court did not err by including enlargement and expansion in the definitions.
delete line spacingdelete line spacing

### D.

Plaintiffs next argue the court committed error by finding that the RVRSA project is still in operation and that plaintiffs are still obligated to pay towards RVRSA's operating maintenance and repair costs. Specifically, plaintiffs contend there have been so many additions and replacements to the facility that it could not be characterized as the same "project" and, therefore, no longer "maintained in operation" within the meaning of paragraph 7. They claim that the relevant part of paragraph 7 is ambiguous, and, therefore, the trial court should have evaluated the parties' intent upon signing the 1971 settlement

44

agreement and its 1984 amendment or considered other evidence outside those documents. We do not agree.

In its October 2018 decision granting partial judgment to defendants, the trial court stated, "[p]laintiffs are obligated to contribute towards RVRSA's operating, maintenance, repair or upkeep costs because the RVRSA 'project' as defined in the 1971 [agreement] is 'maintained in operation,' as stated in the 1971 [agreement's] [p]aragraph 7." The court further found:

> it is clear in paragraph 7 of the [agreement], that the "project" is the new treatment facility and appurtenances. Further, the intent of the parties, with regard to the meaning of maintained in operation, which is plain language, has only one reasonable and unambiguous meaning[:] that the facility and appurtenances continue to process and treat wastewater. It is clear that the "project" is maintained in operation, as the facility has continued to process and treat wastewater. There is no evidence that the operation has ceased treating wastewater. As long as the facility processes wastewater, regardless of whether parts were replaced or expanded upon, the "project" remains in operation.

Reading the plain language of the agreement, we conclude plaintiffs are not responsible for any costs when RVRSA's treatment plant is enlarged or expanded beyond 12 mgd. Quinn, 410 N.J. Super. at 533. The record contains no facts to suggest that, even with expanded or enlarged repairs or maintenance, the project has begun operating beyond 12 mgd. Additionally, no witnesses

45

testified that the project has ceased treating wastewater. It follows that plaintiffs' obligation under the 1971 agreement and the 1984 amendment continues. We conclude there is no error here.

E.

Plaintiffs contend the court erred in ruling that certain claims are barred by the waiver and release provisions in the 1984 amendment. They argue the "fundamental issue" is whether their equitable claims should be precluded because the parties are working with different and updated facts. Once again, they argue that the 1971 agreement has been in effect for more than a reasonable time and has cost Jersey City taxpayers over $100 million for nothing in return. We disagree for the cogent reasons stated by the 2014 motion court.

In its August 2014 order, the court granted defendants' partial summary judgment motion and dismissed plaintiffs' second count "to the extent that it includes rights or claims that were or could have been raised at the time of the 1984 [s]ettlement [a]greement." The court found that while "the waiver provision does not apply to claimed rights that arose after the entry of the 1984 [a]greement," it does apply to Jersey City's:

> waived rights or claims that it asserted or could have asserted in its 1982 [c]omplaint, e.g., the de minimus amount of Jersey City waste treated by the RVRSA, that Jersey City was coerced into entering into the 1984

[s]ettlement [a]greement because the Rockaway River was polluted, that federal and state environmental laws required the [m]unicipal [d]efendants to treat Jersey City's water at their exclusive expense, that Jersey City residents are less wealthy than the residents of the [m]unicipal [d]efendants and the unfairness of the O&M [operation and maintenance] formula as written.

Concerning the 1984 amendment's release provision, the court stated:

In the 1982 [c]omplaint, Jersey City sought to alter the formula used to calculate its obligation to RVRSA because: (1) Jersey City's revenues had declined, which grossly diminished its ability to comply with the existing formula; (2) the costs under the existing formula rose to a level that was unforeseeable at the time of the 1971 [s]ettlement [a]greement; and (3) it would be detrimental to Jersey City to construct the new facility under the existing formula.

While the present issue is over a different formula from that complained of in the 1982 [c]omplaint, the issue in the 2010 [c]omplaint of rising costs remains the same. As highlighted by the RVRSA, Jersey City's complaint in 1982 was based on the same claim as in 2010: Jersey City's supposed financial burden is disproportionate to the [m]unicipal [d]efendants.

This last finding by the court is significant, and we are constrained to agree with the motion court's analysis of this important amendment term. The essence of plaintiffs' 2010 claim closely tracks their 1982 claim, that is, changes in financial and regulatory circumstances warrant modification or outright

47

termination of the settlement agreement.  It follows that the 1984 amendment, which barred claims that were or could have been raised in plaintiffs' 1982 complaint operated to bar like claims in the 2010 complaint.

The motion court committed no error in its 2014 order.

## F.

Plaintiffs contend the court erred by dismissing their damages claim against RVRSA to recover the interest it failed to pay for applying the $500,000 credit over twenty years as installment payments.  We find this claim without merit, and comment briefly.

Plaintiffs do not refute having knowledge of the potential claim during the interim between the settlement and the filing of their latest complaint in 2010. Until plaintiffs filed in 2010, they raised no objection to RVRSA's application of 1984 amendment credit payments for over twenty years.

"Laches is an equitable doctrine, operating as an affirmative defense that precludes relief when there is an 'unexplainable and inexcusable delay' in exercising a right, which results in prejudice to another party."  Fox v. Millman, 210 N.J. 401, 417-18 (2012) (quoting Cnty of Morris v. Fauver, 153 N.J. 80, 105 (1998) (citations omitted)).

Because plaintiffs had more than two decades to pursue their claims over the $500,000 credit, we conclude that the trial court did not err in dismissing this claim.

G.

Plaintiffs contend the court erred by not finding that the amended settlement agreement violated federal public policy and the Clean Water Act[7] (the Act). Plaintiffs argue on appeal that contracts contrary to federal water conservation policy are illegal and void, and that the 1971 settlement agreement and its 1984 amendment violate the Act's conservation policies and, therefore, require termination. We disagree.

The record shows plaintiffs waived their claim pursuant to? the federal regulations they assert were in effect prior to the 1984 amendment. . Plaintiffs elected not to incorporate the relevant federal laws into the 1984 amendment and we are therefore satisfied plaintiffs waived this claim. Where parties have agreed to the terms of a settlement, "second thoughts are entitled to absolutely no weight as against our policy in favor of settlement." Dep't of Pub. Advoc. v. N.J. Bd. of Pub. Utils., 206 N.J. Super. 523, 530 (App. Div. 1985).

---

[7] 33 U.S.C. §§1251-1387.

H.

Plaintiffs contend the court erred by ruling that RVRSA has no fiduciary duty to its member municipalities, which include plaintiffs. We are unpersuaded.

Plaintiffs submit that they should be relieved of their financial obligations under the agreement because there is a fiduciary relationship between them and RVRSA. Plaintiffs posit that RVRSA breached its fiduciary duty by: its re-characterization of capital costs as "operating, repair and maintenance" expenses solely for purposes of billing Jersey City; making "retaliatory" counterclaims; and overcharging plaintiffs by misapplying the $500,000 credit owed under the agreement. They assert that RVRSA has an obligation to assess its members fairly; thus, the settlement agreement must be voided on equitable grounds as they are being charged more than the other members. We do not agree, as the relationship between the parties was contractual and it was defined by the 1971 settlement agreement and the 1984 amendment.

Parties of equal bargaining power may contract as they wish. Marcinczyk v. State of N.J. Police Training Comm'n, 203 N.J. 586, 592-93 (2010). "[A] fiduciary relationship is not created 'between mutually interdependent businesses with equal bargaining positions who dealt at arms-length.'"

We conclude RVRSA had no fiduciary obligation to plaintiffs and discern no error.

## I.

Plaintiffs contend the court erred by not terminating the settlement agreement as void due to RVRSA's material breaches. They specifically point to RVRSA's misapplication of the $500,000 credit, improper recategorization of costs, and the assertion they have continuously and substantially performed their obligations under the agreement. We are unconvinced.

"It is black letter contract law that a material breach by either party to a bilateral contract excuses the other party from rendering any further contractual performance." Magnet Res., Inc. v. Summit MRI, Inc., 318 N.J. Super. 275, 285 (App. Div. 1998). "If the breach is material, i.e., goes to the essence of the contract, the non-breaching party may treat the contract as terminated and refuse to render continued performance." Ross Sys. v. Linden Dari-Delite, Inc., 35 N.J. 329, 341 (1961). "Whether conduct constitutes a material breach is ordinarily a question reserved for disposition by the [factfinder]." Chance v. McCann, 405 N.J. Super. 547, 566 (App. Div. 2009). "Where a contract calls for a series of acts over a long term, a material breach may arise upon a single

occurrence or consistent recurrences which tend to defeat the purpose of the contract." Magnet, 318 N.J. Super. at 286

First, plaintiffs argue that RVRSA miscalculated the $500,000 credit, they were overbilled as a result, and deserved interest on that credit.

Where an agreement is clearly written and leaves no room for interpretation, a court must enforce it according to its plain terms, even if one party claims to have had an intention different from that outwardly manifested in the agreement. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). "'[I]f the contract into which the parties have entered is clear, then it must be enforced' as written." In re County of Atlantic, 230 N.J. 237, 254 (2017) (quoting Maglies v. Est. of Guy, 193 N.J. 108, 143 (2007)).

The record shows that the 1984 amendment to the agreement unambiguously refers to the $500,000 credit without more. We find no error.

Next, plaintiffs argue that RVRSA's reclassification of its capital improvement projects increased their 2010 assessment by $103,597 while, at the same time, reduced the 2010 collective assessments of the municipal defendants by that same amount. Thus, they argue that RVRSA's impermissible reclassification of capital projects as operation, maintenance, and repair expenses was a clear material breach.

"We defer to the credibility determinations made by the trial court because the trial judge . . . [is] afford[ed] . . . 'a better perspective than a reviewing court in evaluating the veracity of a witness.'" Gnall v. Gnall, 222 N.J. 414, 428 (2015) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).

In our view, the court properly declined to find that RVRSA's conduct constituted a material breach when it relied on deposition testimony from Edward Ho, the RVRSA executive director since 2002.

J.

Next, plaintiffs contend the court erred by failing to dismiss part of RVRSA's counterclaim. We decline to address the argument because the trial court dismissed defendants' counterclaim for damages "for [their] failure to prove the amount of said damages during the damages trial that commenced on March 22, 2021 and concluded on May 28, 2021."

An issue is moot if the decision "can have no practical effect" on the controversy. City of Plainfield v. N.J. Dep't of Health & Senior Servs., 412 N.J. Super. 466, 483-84 (App. Div. 2010) Generally, "courts should not decide cases where a judgment cannot grant relief." Marjarum v. Twp. of Hamilton, 336 N.J. Super. 85, 92 (App. Div. 2000). Plaintiffs' claim here is moot.

K.

Plaintiffs contend the trial court erred in granting RVRSA's motion to transfer venue, and request reversal and remand for a new trial. Plaintiffs argue that the court's decision to transfer the matter to Morris County "was grossly improper" and "severely prejudiced" them because Morris County is RVRSA's "home field[.]" Instead, plaintiffs contend Hudson County is the proper venue because the initial litigation leading to the 1971 agreement was prosecuted in Hudson County. They argue that Jersey City's taxpayers feel the brunt of plaintiffs' payments to RVRSA. Plaintiffs assert, "[a]t the very least, the case should be heard in a 'neutral' county," such as "Essex, Passaic or Union County."

The trial court's decision to grant a motion for a change of venue is reviewed for abuse of discretion. State v. Nelson, 173 N.J. 417, 476-77 (2002). The court's exercise of discretion "must be neither arbitrary, vague nor fanciful and must be in consonance with well[-]established principles of law[;] . . . [t]he exercise of such discretion will not be disturbed on review unless it has been clearly abused." State v. Collins, 2 N.J. 406, 411 (1949).

Rule 4:3-2(a) states in part: "Venue shall be laid by the plaintiff in Superior Court actions as follows: . . . (2) actions not affecting real property which are brought by or against municipal corporations, counties, public

54

agencies or officials, in the county in which the cause of action arose."  Thus, "[t]he right of a litigant to choose his own forum is required to yield to the venue Rule's objective of minimizing inconveniences to public entity defendants." Fine v. Rutgers, State Univ. of N.J., 163 N.J. 464, 472 (2000).

Rule 4:3-3(a) permits a change of venue:  "(1) if the venue is not laid in accordance with R[ule] 4:3-2; or (2) if there is a substantial doubt that a fair and impartial trial can be had in the county where venue is laid; or (3) for the convenience of parties and witnesses in the interest of justice."  "[I]f the motion is made pursuant to Rule 4:3-3(a)(2) or (3), the movant has the burden of demonstrating good cause for the change.  If the motion is made pursuant to Rule 4:3-3(a)(1), the respondent has the burden of demonstrating good cause for not making a change."  Pressler & Verniero, Current New Jersey Court Rules, cmt. to R. 4:3-3 (2025).

The Hudson County judge made findings when he granted the motion. to transfer venue.  The judge found plaintiffs could "get just as fair a shake in Morris County as . . . in Hudson County."  He explained that "[t]he real issue" was a challenge to the agreement and that plaintiffs' only connection to Hudson County was through the reservoir as a water source.  The judge noted that treatment facility administration, including billing, was connected to Morris

County. The judge found it a "stretch" to determine "the cause of action arose [in Hudson County]," as "it is much more convenient for this matter to be litigated in Morris County."

Plaintiffs produced no evidence of bias from the Morris County court. Their claim of proximity between the two courthouses reinforces the judge's rationale for the order. Furthermore, the 1984 amendment and many other related records are either filed with the Morris County Court or located in Morris County.

We conclude that the judge did not abuse its discretion in granting RVRSA's motion and transferring venue.

## L.

In their cross-appeal, defendants contend that the court erred in failing to award damages for the monies allegedly withheld by plaintiffs under the 1971 settlement agreement and the 1984 amendment. They argue the court erred in finding that RVRSA's usage of a three-year average daily plant flow in the applicable formulas was flawed in formulating a calculation of damages.

The questions we consider here are: did defendants lay a proper foundation to enable the court to make a fair and reasonable estimate of damages; and are the court's findings sufficiently grounded in the competent,

relevant and reasonably credible evidence in the record so as to survive appellate review. We conclude defendants failed to present sufficient proofs on this question and that the court's order was grounded in the record.

"Under contract law, a party who breaches a contract is liable for all of the natural and probable consequences of the breach of that contract." Totaro, Duffy, Cannova & Co., LLC v. Lane, Middleton & Co., LLC, 191 N.J. 1, 13 (2007) (quoting Pickett v. Lloyd's, 131 N.J. 457, 474 (1993)). However, claimants have a "responsibility at trial to prove that damages are ascertainable." Caldwell v. Haynes, 136 N.J. 422, 437 (1994). That is, the non-breaching party must "prove damages with such certainty as the nature of the case may permit, laying a foundation which will enable the trier of the facts to make a fair and reasonable estimate." Totaro, 191 N.J. at 14 (quoting Lane v. Oil Delivery, Inc., 216 N.J. Super. 413, 420 (App. Div. 1987)). "[T]he exact amount of the loss need not be certain." Ibid. (quoting Donovan v. Bachstadt, 91 N.J. 434, 445 (1982)).

The 1971 settlement agreement required plaintiffs to pay RVRSA "[a]n amount which represents [Jersey City's] share of the annual operating, maintenance, repair and upkeep expenses of the project bearing the same ratio

57

to the total annual operating, repair, and maintenance costs that 4.5 million gallons per day bears to the average daily plant flow."

The 1984 amendment required plaintiffs to pay RVRSA "[a]n amount which represents Jersey City's share of the operating maintenance, repair and upkeep expenses of the New Treatment Facilities and New Interceptor, bearing the same ratio to the total annual operating, maintenance, repair that 4.5 million gallons per day bears to the average daily plant flow."

However, defendants did not use either of those formulas to calculate payments. The record shows RVRSA calculated payments using a formula with a three-year average daily flow rather than an annual average daily flow.

In its November 2021 order, the trial court dismissed defendants' counterclaims seeking damages "for [defendants'] failure to prove the amount of said damages."

The court stated:

> the parties and the [c]ourt are bound to abide by the plain language of the 1984 [s]tipulation requiring RVRSA to calculate billing based upon an annual average daily plant flow, and not a three-year average. RVRSA's reliance on the 2002 [r]esolution is misguided because it is devoid of any reference that it was intended, by agreement or otherwise, to modify the 1984 [s]tipulation's "operating, maintenance, repair and upkeep" billing formula. Indeed, RVRSA has failed to submit any authority that would permit the 1984

> [s]tipulation to be amended by a unilateral resolution of the RVRSA without plaintiffs' express written consent.

The court found that "RVRSA's interpretation to allow unilateral modification to the [settlement agreement and its amendment] would provide it with the unfettered discretion to modify the duration of the 'average' used, or any other provision, under the guise that the 1984 [amendment] is not specific enough." The court also rejected any application of the doctrines of equitable estoppel and laches to defendants' counterclaims, finding "no evidence on the record demonstrating that plaintiffs had actual knowledge that RVRSA switched from a one-year average daily flow to a three-year average daily flow to calculate its proportionate share of contribution to the RVRSA, or that RVRSA relied to its detriment on plaintiffs' silence on the topic." Without supported damages calculations based on the 1984 amendment, the court found "no rational factfinder would be able to calculate a damage award." The court then denied reconsideration, stating:

> [c]onsistent with the express language of [p]aragraph 6(c) of the 1984 [s]tipulation, and RVRSA's own application of the annual average daily flow formula for nearly two decades, [he] did not err in finding that the three-year average daily flow formula is inconsistent with the plain language of the 1984 [s]tipulation, requiring parties to utilize the annual average daily plant flow formula, which was based on substantial credible evidence in the trial record. Indeed, the [c]ourt

has not been presented with any new information or evidence of which the parties were not already aware. Therefore, the [c]ourt's finding that a three-year average daily flow formula is inconsistent with the 1984 [s]tipulation is not palpably incorrect or irrational, and does not warrant reconsideration.

Our review of the record reveals no facts supporting the application of equitable estoppel, judicial estoppel, or laches. See Fox, 210 N.J. at 417-18 (providing that laches precludes relief when "unexplainable and inexcusable delay" in exercising a right) (quoting Fauver, 153 N.J. at 105); Knorr, 178 N.J. at 178 (providing that equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment"); Cummings v. Bahr, 295 N.J. Super. 374, 385-86 (App. Div. 1996) (providing that judicial estoppel bars a party from asserting a position contrary to a position previously asserted in same litigation).

We conclude there is no merit to RVRSA's interpretation that the settlement agreement and its amendment allows the use of any average flow because the word "annual" does not appear before the phrase "average daily plant flow" and does not appear in the denominator of paragraph 6(c)'s formula. The word "annual," however, appears in the numerator of the formula in describing RVRSA's "annual operation, repair, maintenance and upkeep expenses." Reading paragraph 6(c) as a whole, it specifies that "expenses" and

60

"flow" bear "the same ratio," and therefore, the annual expenses in the numerator must be paired with the annual plant flow in the denominator.

It is well settled that our jurisprudence does not permit unilateral amendments to existing agreements to change material terms.

> [A] proposed modification by one party to a contract must be accepted by the other to constitute mutual assent to modify; unilateral statements or actions made after an agreement has been reached or added to a completed agreement clearly do not serve to modify the original terms of a contract.
>
> [Namerow v. PediatriCare Associates, LLC, 461 N.J. Super. 133, 144 (App. Div. 2018) (quoting McGrath v. Poppleton, 550 F. Supp. 2d 564, 571 (D.N.J. 2008)).]

The record reveals no evidence that plaintiffs ever assented to the three-year change for their costs; they clearly did not assent before or at the time the 2002 resolution was adopted. The record also shows the RVRSA had assessed plaintiffs using an annual average daily plant flow for nearly twenty years after the 1984 amendment.

We conclude the court did not err by rejecting defendants' counterclaim for damages.

While we affirm, we do so with serious reservations. Our analysis leads us to conclude that plaintiffs' appeal fails; however, the policy challenges presented by this increasingly unbalanced agreement between municipal entities

are evident. Plaintiffs, and by extension, the residents and taxpayers of Jersey City, are adversely impacted by the regional sewer agreement negotiated over fifty years ago. The record shows Jersey City's municipal revenues began to decline in the mid-to-late 20th century, compromising plaintiffs' continued ability to subsidize certain ongoing costs of running the RVRSA. While this decades-old arrangement clearly contained terms which were once mutually beneficial, we can take judicial notice of the fact that the economic and regulatory climate in which the parties now operate is substantially different from the by-gone era in which these municipal sewer treatment partnerships were originally conceived and formed. The record shows that the fee-for-service contractual relationship between the parties now primarily benefits defendants, their residents and taxpayers. The undisputed evidence tells us that the event which can operate to terminate the agreement is the expansion of the RVRSA plant capacity beyond 12 mgd. The record evidence leads to a strong inference that the decision to expand plant capacity beyond 12 mgd is within the sole control of defendants. Plaintiffs, as well as their residents and taxpayers, may never be able to extricate themselves from the fiscal harm caused by this decades-old binding agreement.

62

That said, the 1984 amendment, which compels plaintiffs continued partial subsidy of the RVRSA facility through its waiver and release language, is clearly authorized by the Legislature through N.J.S.A. 40:14A-23 and -24. We are mindful that those statutes permit municipal sewerage contracts "to pay or provide for the expenses of operation and maintenance of the sewerage system . . . with or without consideration and for a specified or an <u>unlimited</u> time . . . ." N.J.S.A. 40:14A-23 (emphasis added).

We share the concerns expressed by the Chancery Division in <u>City of New Brunswick v. Borough of Milltown</u>, 191 N.J. Super. 467, 468-69 (Ch. Div. 1983). There, the court found it "inequitable" and "grossly unfair" to require "New Brunswick to perform a contract made [sixty-nine] years ago[,] whose burdens have radically and significantly increased in ways never contemplated by the parties." <u>Id.</u> at 469, 489.

In <u>City of New Brunswick</u>, the city entered into a 1914 contract which provided, in part, for the free disposal by the city of Milltown's sewage. <u>Id.</u> at 470. Since 1914, New Brunswick's costs "radically increased in ways the parties never contemplated" while Milltown's burden remained "miniscule," and the court declared that "[o]ne group of taxpayers has no right to impose on another

63

a burden heavier in radical and significant ways than was ever imagined when the burden was first accepted [sixty-nine] years ago" Id. at 484-85.

In this instance, we are constrained by the record before us, including plaintiffs' choice to release and waive their claims under the 1984 amendment. We cannot rewrite a different or better contract than the one the parties originally bargained for. Cypress Point Condo., 226 N.J. at 415; E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc., 365 N.J. Super. 120, 125 (App. Div. 2004).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1587-21